ESTES *v.* GERMAN NATIONAL BANK.

Opinion delivered February 8, 1896.

| 62 | 7 |
|----|----|
| 67 | 551 |
| 62 | 7 |
| f79 | 51 |
| 62 | 7 |
| 89 | 446 |

DEED—PRESUMPTION OF DELIVERY.—The presumption that a duly recorded deed has been delivered is not rebutted by proof merely that, after it was acknowledged and before it was recorded, it was in the possession of the president of the grantor, a corporation.

CORPORATION—AUTHORITY OF OFFICERS TO MAKE CONVEYANCE.—A conveyance of land, executed by the president and secretary of a corporation, without authority from the board of directors, is valid as to one to whom the purchase notes have been transferred in good faith as collateral security, carrying the vendor's lien, where the directors had adopted the practice of assenting separately to the making and execution of contracts by such officers, and the corporators had ratified such practice by long acquiescence.

SALE OF LAND—RETENTION OF POSSESSION BY VENDOR.—The fact that a grantor of land retained possession of it and collected the rents after transfer of the purchase money notes cannot affect the validity of the conveyance as against a *bona fide* holder of such notes.

Appeal from Prairie Circuit Court in Chancery, Southern District.

JAMES S. THOMAS, Judge.

*Rose, Hemingway & Rose* and *Thos. C. Trimble* for appellant.

1. There was no sale or conveyance of the lands to Echlin, and hence there was no vendor's lien. The pretended sale was never authorized by the board of directors. It was intended as a sham—a scheme. The grantee never entered into possession, never claimed the land, never paid taxes on it, nor received any rents, and the pretended *deed was never delivered to him.* Delivery of the deed was essential; and, even if the bank were conceded to be the agent of Echlin to accept the deed, the rights of appellant under their attachment antedated the filing of the deed and could not be impaired by relation. 1 Devlin on Deeds, sec. 285; 11 Bush, 34; 21 Am. Rep. 205; 105 Mass. 560; 7 Am. Rep. 554; 58 Ill. 310; 11 Am. Rep. 67. It has been said that a deed of a corporation is valid without delivery. 1 Devlin, Deeds, sec. 344. But it has long since been overruled. 9 East, 360; 102 U. S. 397; 5 Am. & Eng. Enc. Law, p. 446; 5 *id.* p. 445, note 3. The deed does not purport to be attested by the corporate seal, and without it it is void. 1 Jones, Mortg. sec. 81; 18 Ark. 279; 23 *id.* 439; 2 Black, 715; 3 Sawyer, 90; Waite, Insolvent Corp. sec. 488; 105 N. C. 131; 18 Atl. 1063; 10 Allen, 251. There was no meeting of the directors or stockholders to authorize the making of the deed. Directors have "no authority to act, save when convened in a board meeting." 54 Ark. 50; 55 *id.* 475.

2. Even conceding that the sale and deed are valid, the appellee has no vendor's lien. *(a)* The notes do not purport to reserve a lien; and, if they did, they would be inoperative in that respect. 7 Ark. 254; 33 *id.* 393; 31 *id.* 597; 34 *id.* 81; 30 *id.* 600; 51 *id.* 436. *(b)* Our statute only passes the lien to an assignee, when ex-

pressed upon the face of the deed or conveyance. Sand. & H. Dig. sec. 490. The equitable lien does not pass to the assignee. 18 Ark. 172; 25 *id.* 132; 30 *id.* 155; 33 *id.* 80; 32 *id.* 250; 31 *id.* 142; *ib.* 250; 27 *id.* 230.

*Ratcliffe & Fletcher for appellee.*

1. No question is made by appellants as to the form of the deed to Echlin, and none can be made. 1 Devlin, Deeds, sec. 468; 95 U. S. 710; 78 Mo. 482; 77 *id.* 180; 25 Mich. 74; 1 Am. & Eng. Enc. Law, 159, 160; 43 N. H. 343; 51 Md. 508; 63 Tex. 91; 23 *id.* 480; 70 Mo. 290.

2. The evidence is sufficient to show a valid sale and delivery of the deed. The presumptions are that the deed was executed and delivered on the day of its date, and was regular. 14 Ark. 29; 62 Wis. 380; Wait, Insolv. Corp. sec. 490; 37 Cal. 544; 93 *id.* 300. The answer admits that the corporate seal was attached, and the decree so recites. But in those states where private seals are abolished, the corporate seal is no longer *essential.* Wait, Insolv. Corp. secs. 10, 488; 43 N. J. L. 325; 60 N. Y. 96; 58 Ga. 547; 62 Ala. 392. The evidence shows that the deed was filed before the levy was made.

3. No meeting of the board was necessary. It was composed of three persons. The deed was made to *one,* and was signed *by* the other two. Here was a *meeting* of the minds of all the board concurring and acting in the same transaction. The rule seems to be that where there is a customary usage for the directors to adopt a certain course of transacting business by consultation and agreeing upon such course, no formal meeting is necessary, in the absence of statute or by-law requiring a different mode. 11 Col. 551; 19 Pac. 508; 12 N. H. 227; 23 *id.* 556–7; 55 Am. Dec. 215–16. All presumptions are in favor of the regularity of the sale. 12

Wheat. 70; 131 U. S. 371; 47 Me. 55; 57 Ark. 355; 1 Beach, Priv. Corp. 296.

4. The articles of association do not contemplate the necessity of any authority from the board of directors to enable the president to act in cases like this. The sale of land and the signing of *papers* was entrusted to him. But if a formal meeting was necessary, the subsequent conduct of the board is a sufficient ratification. 131 U S. 371, 390; 77 *id.* 604; 101 *id.* 181; 66 Fed. 22; 67 *id.* 49; 91 U. S. 592; 67 Fed. 464; 28 Ark. 59; Mechem on Agency, secs. 118, 153–155; 55 Ark. 240; 159 Mass. 505; 12 Wheat. 70.

5. The bank took the notes in good faith, in the usual course of business, without any notice of any want of authority or irregularity, and the company received and used the money without objection or warning. This is enough to invoke the doctrine of estoppel. Even if it be true that the notes were given solely to enable Emonson to use them as collateral security, and that the deed was executed solely that he might exhibit the same to the bank, this would present a case of *fraud*, from which the company could take no advantage, and appellants can claim no greater right than the company. 101 U. S. 181; 58 N. W. 943; 56 Fed. 167; 64 *id.* 710; . 159 Mass. 505; 59 Fed. 338; 117 U. S. 96; 35 Ark. 376; 57 *id.* 355; 65 Fed. 65; 12 N. H. 227; 7 Mo. App. 294; 70 Mo. 290; 78 N. Y. 187; 1 Watts, 385; 96 U. S. 640; 66 Fed. 104; 23 How. 469; 10 Wall. 604; 101 U. S. 347; 133 *id.* 431; 34 N. Y. S. R. 16; 78 N. Y. 131; 10 *id.* 66; 122 *id.* 188; 55 Fed. 1; 11 Wall. 482; 2 Moraw. Corp. secs. 610, 611. The company has never questioned the validity of the sale, and appellants should not be permitted to do so. 51 Fed. 1.

6. Appellants can claim no greater right than the company. Their levy was simply on such right as the company had in the land. If their levy was before the

deed to Echlin was filed for record, it could not affect
the bank's rights.    The appellants were notified of the
bank's claim before sale, and they could not claim to be
*bona fide* purchasers at their own execution sale.    33
Ark. 621; Bigelow on Fraud, 407 ; 16 Ark. 559 ; 55 *id.*
122–3; 41 *id.* 370 ; 55 *id.* 542, 11 Wall. 482.    It is no
answer to the bank's claim for a lien that appellants
credited the company without knowledge of the lien,
41 Ark. 186.

7.    It is not necessary that a lien for purchase
money be expressly reserved, in order to inure to the
benefit of the assignee of the note.    Sand. & H. Dig. sec.
490.    It is enough if it *appears from the face of the
conveyance*, and in this case it expressly appears that
Echlin had given his notes for the purchase money.    37
Ark. 571; 17 Wall. 1–9.    But, aside from the statute,
appellant is entitled to assert the equitable vendor's
lien, as the notes were assigned as *collateral security*.
24 Ark. 563 ; 28 *id.* 66, 70 ; 41 *id.* 292 ; 32 *id.* 250.

*Thos. C. Trimble* and *Rose, Hemingway & Rose* in
reply.

1.    The lien dates from the time the writ came to
the sheriff's hands.    Sand. & H. Dig. sec. 341.

2.    There is no evidence of the delivery of the deed
to Echlin, but everything to the contrary.    The pre-
sumption of delivery only arises where the deed is found
in possession of the grantee.    1 Devlin, Deeds, sec. 294.
If the deed is found in the possession of the grantor, the
presumption does not exist.    29 N. E. 870 ; 17 S. W.
319 ; 30 N. E. 1041; 50 N. W. 19; 55 Ark. 641; 54 N.
W. 61 ; 17 S. W. 213; 22 *id.* 560 ; 36 N. E. 955 ; 35 *id.*
94.    The mere fact that a deed was acknowledged will
not warrant a finding that it was delivered.    35 N. E.
94.    The burden in this case was upon appellee.    34 N.
E. 1130.    The mere fact that a deed has been recorded

is no evidence of delivery.  13 Atl. 883; 11 N. E. 498; 73 Iowa, 186.  If the grantor keeps the deed, no title passes.  79 Me. 257; 11 N. E. 893.  See, also, 1 Jones, Mortg. sec. 84; 1 McCrary, 578; 1 Jones, Mortg. secs. 85-6.

3.  The lien claimed by appellee is a statutory one. Sand. & H. Dig. sec. 490.  It is really a mortgage.  2 Jones, Mortg. sec. 1111; 1 Woods, 386.  It was not therefore binding on attaching creditors until the deed was filed for record.  54 Ark. 179; 34 Iowa, 499; 20 id. 440; 49 Mo. 64.

4.  The deed was void, because made without any corporate action.  The making of a deed is not a mere act of routine.  The fact that some of the directors concurred is of no importance.  If *all* the directors had joined in the execution of the deed, without a board meeting, it is void.  54 Ark, 60; 52 id. 515; 55 id. 480. Under a grant of general powers, the president has no authority to sell or convey lands.  4 Thomps. Corp. sec. 4647.

BATTLE, J.  The German National Bank brought this action against the Emonson Mercantile & Manufacturing Company, G. M. Echlin, Z. N. Estes & Co., and other creditors of the Emonson Company, to foreclose a lien on certain lands lying in Prairie county, in this state.  The pleadings in the case present the following state of facts:

1.  In behalf of plaintiff, it was alleged that the Emonson Company, being the owner of the lands before mentioned, sold them in good faith to G. M. Echlin, for the consideration of $21,200, and conveyed them to him by a deed duly executed, acknowledged and recorded; that Echlin executed to the company seven notes for the purchase money, payable respectively at two, three, four, five, six, seven and eight years after date, which were described in the deed.

2.  That these notes were transferred by the Emonson Company to the bank as collateral security for a large sum of money loaned, before maturity, for a valuable consideration, and "without any notice whatever of any irregularity, illegality or fraud in reference thereto by any one;" and that of the sum loaned and secured, as stated, $11,400 was due by the company to to the bank at the commencement of the suit.

In behalf of Z. N. Estes & Co., they being the only defendants who answered, it was alleged:

"1.  That on the 6th of January, 1891, they began a suit in the circuit court against the Emonson Company to recover a debt of $6,547.88, and sued out an order of attachment that was on that day levied on the lands in controversy; that they recovered judgment for the amount sued for on the 25th of July, 1891, and the court sustained the attachment, and ordered the lands to be sold to satisfy the same, which remains unpaid and in full force.

"2.  That the Emonson Company was a corporation created by the laws of Arkansas; that its officers were a president, vice-president, secretary and treasurer, and that it had a corporate seal; that the deed set up in the complaint was made by A. Emonson, the president of the company, without consultation with his co-directors, without any meeting of the directors, and without any authority from them; that the deed was wholly unauthorized by the company; and that in executing it Emonson was acting in his individual capacity solely, there never having been any meeting of the directors for the purpose of considering the matter of the sale of the lands, or at which the same was considered; that the transaction was wholly unknown to the stockholders of the corporation; that the minutes and records of the board of directors fail to show that any action was ever taken concerning this pretended sale

and conveyance; and that the appellee acquired no title thereby.

"3. That G. M. Echlin never took possession of the lands, and never exercised any control over them; that, after the said pretended sale, the Emonson Company continued in possession of them, paid taxes on them up to the time that they were attached by the appellants, and continued to receive the rents and profits thereof, which facts were notorious, and were known to the appellee, or would have been learned if proper inquiry had been made.

"4. That the pretended deed to G. M. Echlin was made long after its date; that it was executed solely for the purpose of using the notes mentioned in the complaint as collateral security for a loan from appellee, and that, after it was executed, it was deposited in a private drawer of A. Emonson in the safe of the Emonson Company, and was never delivered to G. M. Echlin, who was not aware of its existence; that the deed was filed for record without the authority of the grantee; that it was not filed until after the attachment of appellants was sued out, when the appellee procured its filing by Emonson, the appellee being then aware of these facts.

"5. That in the meantime, before the filing of the deed, and in ignorance of it, the appellants, on the faith that the Emonson Company owned the lands, extended credit to it, and permitted it to contract the debt for which they recovered judgment."

The facts, as we find them, are substantially as follows: The Emonson Company was a corporation, formed and organized under the laws of the state of Arkansas. Its stockholders were A. Emonson, who owned more than one-half of the stock subscribed, G. M. Echlin, Caroline Shipness, W. C. Shipness, and W. J. Johnson. A. Emonson, P. W. Echlin, and G. M.

Echlin were its board of directors. A. Emonson was its president, G. M. Echlin, vice-president, and P. W. Echlin was its secretary and treasurer, and Carlisle, in Prairie county, Arkansas, was its place of business.

The purposes of the corporation, as stated in its articles of association, were as follows : "The company shall be, and is hereby, authorized to do a general mercantile and manufacturing business in all its branches, making and manufacturing hay, ginning and pressing cotton, operating flour and grist mills, establishing and operating oil mill and saw mill, making and manufacturing staves, barrels and farming implements, *buying and selling real estate*, owning and operating farms, raising, buying and selling live stock, running a banking and brokerage business, publishing a newspaper, and running a job office."

The duties and authority of the president of the company were defined by the articles of association as follows : "The president shall preside at all meetings of the board of directors, and be recognized as the superior officer of the company, and shall give such attention to its affairs as may be necessary for its success. He may borrow money for and in the name of the company, shall sign all checks and drafts, execute papers, and endorse notes for and in the name of the company ; shall, in connection with the secretary and treasurer, sign all certificates of stock, and such other documents as may be necessary or required by the board of directors ; shall have general management, supervision, and control of the employees ; have charge of all credits, purchases, sales, freight rates and commission sales ; shall conduct all the correspondence, and perform all other duties not otherwise provided for in these articles."

The president being vested with extensive authority, and the board of directors being composed of only three

members,—the president, vice-president, and secretary (who was also treasurer),—the management of the business of the company was left largely to the president and secretary. The board usually met only once a year, and then to elect officers, and to investigate any business which it deemed proper, and always adjourned subject to the call of the president. They never had any meeting of the board to authorize the president and secretary to borrow money, and yet the president borrowed money. They sold land, but never had a meeting of the board in relation to the same.

In the course of its business the company acquired a large area of lands, among which was the land in controversy. On the second day of January, 1888, the lands which are the subject of this litigation were sold to G. M. Echlin, at and for the price and sum of $21,200, for which he executed to the company his seven promissory notes, payable, respectively, to the order of the company, two, three, four, five, six, seven and eight years after date; and stated in each one that it was given in part payment for the lands, describing them. P. W. Echlin, secretary and treasurer, and a member of the board of directors, prepared the deed for the conveyance of the lands by the company to G. M. Echlin. The notes, which were described, were stated to be the consideration of the deed, which was signed as follows : "Emonson Mercantile & Manufacturing Company. (L. S.) A. Emonson, President. P. W. Echlin, Secretary."

On the 17th of January, 1888, A. Emonson, as president, and P. W. Echlin, as secretary, of the company, appeared before a notary public, and stated that they had executed the deed for the consideration and purposes therein mentioned and set forth, and he so certified in a certificate annexed to the deed. There was no meeting of the president and directors to authorize the

conveyance of the lands, or to authorize the officers of the company to mortgage real estate to secure the payment of borrowed money.

Most of the land in controversy was fenced for hay purposes. It produced annually from 500 to 700 tons of hay, which sold from $5 to $8 per ton. The company cut this hay after it sold the land to G. M. Echlin, and never allowed any credit for it on his notes, and he never asked any compensation, and paid the taxes on the land, and never charged him for them.

On the 17th of January, 1888, fifteen days after the sale and conveyance to Echlin, the Emonson Company being indebted to the German National Bank, and, desiring to borrow money, pledged to it the notes of Echlin to secure the company's present and future indebtedness to the bank,—which notes were received in good faith, without any notice that the sale and conveyance of the lands were in any way irregular, illegal, or fraudulent. Upon this security, the bank continued to advance money to the company until its indebtedness to the bank at the commencement of this action amounted to $11,400, which, with the Echlin notes, remains wholly unpaid.

About three years after the execution of the deed to Echlin, in a conversation about the payment of the notes given for the land in controversy, the cashier of the bank asked the president of the company if the deed was recorded, and he replied that he did not remember, but would find out when he returned home, and, if it was not, he would either have it recorded or send it to the cashier. The presumption is, the president returned to Carlisle, the place of his company's business and of the residence of G. M. Echlin; for in a few days he sent the deed to the cashier of the bank, who, finding that it had not been recorded, filed it for record on the 9th of January, 1891.

2

There is no controversy about the judgment recovered by Estes & Co., or the validity of the attachment in their favor, which was sustained by the court.

The circuit court decreed that the notes executed by G. M. Echlin were a lien on the lands, that it be foreclosed by a sale of the lands, and that the proceeds be applied to the payment of the debt due to the German Bank, and, if there was any residue, that it be applied to the payment of the company's indebtedness to Estes & Co.; and they appealed.

Presumption as to delivery of deed.

Appellants insist that this decree should be reversed, for the reason, among others, there was no legal sale of the lands to Echlin. They contend that the deed was never delivered to the grantee. In disproof of this contention, the certificate of the acknowledgment of the deed shows that the president and secretary of the Emonson Company appeared before a notary public, and stated that they had executed it for the consideration and purposes therein mentioned and set forth. The deed having been recorded, this is at least *prima facie* evidence of its delivery. (Sandels & Hill's Dig. sec. 721 ; *Jacoway* v. *Gault*, 20 Ark. 190 ; *Wilson* v. *Spring*, 38 Ark. 181 ; *Meyer* v. *Gossett, Ib.* 377). But it is said that the deed was in possession of the company, and was delivered by it to the bank. But that fact does not show that the deed had not been delivered to Echlin. When or how the president of the company got possession of it is not shown. He could have received it from Echlin on his return home, after he promised to ascertain whether it was recorded.

Power of corporate officers to execute deed.

Another reason advanced by appellants for their contention is there was no meeting of the directors or stockholders of the company to authorize the sale of the land or the making of the deed. This is true. But the articles of association show that one of the purposes of the incorporation of the company was to buy and sell

real estate; and that the president was thereby authorized to borrow money for and in the name of the company, to sign all checks and drafts, to execute papers, and indorse notes for and in the name of the company; and that he had charge of all purchases and sales. In connection with this, the evidence shows that the management of the business of the company was largely left to the president and secretary; that the board of directors usually met only once a year, and always adjourned subject to the call of the president; that the president borrowed money without a meeting of the board to give him the authority; and that land was sold without convening the directors to authorize the sale. From this course of conduct, it seems that the president, who owned a majority of the stock subscribed, and the secretary, had the entire management and control of the business of the company, and that no meeting of the directors was thought necessary to confer authority on them, except when the president saw fit to call the board together, which was seldom done. Upon these facts and this evidence, the question presented by the contention of appellants should be considered.

In *Simon* v. *Sevier Association*, 54 Ark. 58, the rule which controls corporations like the Emonson Company, and the reason for it, are stated as follows: "The act * * provides that the stock, property, affairs, and business of such corporations shall be under the care of, and shall be managed by, not less than three directors, and that a majority of the directors, convened according to its by-laws, shall constitute a quorum for the transaction of business. Such directors constitute a board, and, in the management of the property, affairs, and business of their corporations, can only act as a board. They have no authority to act save when convened in a board meeting. The separate, individual action of each director is not the action of the

corporation. Less than all do not, under the statute, constitute a quorum for the transaction of business, unless they are legally convened. No director is required to attend a meeting of directors held without authority. Every one of them is entitled to vote and be heard in all the proceedings of the board. The shareholders in the corporation are entitled to the influence and advice of every director in the management of their affairs. Hence, in order to accomplish the object for which each director was elected, a mere majority of the directors cannot constitute a majority of the board for the transaction of business, unless they meet according to, and by authority of, the by-laws or rules of the corporation, or are called together upon due and legal notice given to all of them."

The object of this rule is the benefit and protection of the share-holders of the corporation. The duties of the board are imposed upon more than one member, in order that they may be discharged with that wisdom derived from a conference, discussion, and a comparing of views upon business affairs ; and for this purpose they are required to meet and take counsel of each other. As all this is for the benefit of the shareholders, who constitute the corporation, they may waive the necessity of the meeting of the board for the transaction of business within their corporate powers. They can do so by permitting the directors to establish a habit or usage of assenting separately to the making and performance of contracts by their agents. By permitting such usages or habits to be formed by a long course of business, they adopt and become bound by them, so long as they acquiesce. If this were not so, great injustice might be done to parties contracting with them in their usual way. "Hence there follows a necessity of giving effect to acts of such corporations, according to the mode in which they allow them to be transacted. If this were not

done, it would become impossible to dispose of such contracts with any hope of reaching the truth and justice of the rights and duties of the several parties involved. And this is certainly nothing of which the corporation can complain. It is merely holding them to such rules of action as they see fit to adopt for their own guidance and the transaction of their business." *Bank of Middlebury* v. *Rutland & W. R. Co.*, 30 Vt. 158, 170; 3 Thompson, Corporations, sec. 3938, and cases cited.

In this case, the president and secretary of the Emonson Company, constituting a majority of the directors, were intrusted with the management and transaction of the business of the corporation, a part of which was the purchase and sale of land. For several years the company continued in existence. In that time, as before stated, the board usually met once a year, and then chiefly for the purpose of electing officers. The inference from this and the other evidence in the case is, the directors adopted the practice of assenting separately to the making and execution of contracts by their agents, and the corporators ratified it by long acquiescence. After the corporation had been in existence for more than four years, and continued this practice, presumably, for that length of time, it sold the land in controversy to G. M. Echlin, two of the board assenting, and the other purchasing. After this, the president, in the exercise of the power vested in him by the articles of association, borrowed money, for and in the name of the company, from the German National Bank, by depositing notes given for this purchase as collateral security. Believing that the notes were secured by liens on the lands sold, the bank advanced large sums of money to the company, in good faith, and without any notice of any infirmity in their security. The company has never repaid the money, but, on the contrary, was indebted therefor at the commencement of this action in

the sum of $11,400.   Under these circumstances, the sale of the land was valid as to the bank, and the lien for the purchase money passed with the notes as collateral security; and the action of the company, and the non-action of Echlin, in reference to the land after the transfer of the notes, did not affect the lien held by the bank.

Effect of transfer of land purchase notes.

The other questions discussed by counsel in their briefs have heretofore been decided by this court in reported cases.

Decree affirmed.