BODCAW OIL COMPANY, INC., v. THE ATLANTIC REFINING COMPANY.

4-9114 228 S. W. 2d 626

Opinion delivered April 10, 1950.

*Heldt & O'Boyle* and *Davis & Allen,* for appellant.

*A. B. Tanco, McKay, McKay & Anderson* and *Armistead, Rector & Armistead,* for appellee.

MINOR W. MILLWEE, Justice. Appellant, Bodcaw Oil Company, Inc., hereinafter called Bodcaw, is a corporation organized under the laws of Delaware; and appellee, Atlantic Refining Company, hereinafter called Atlantic, is also a foreign corporation organized under the laws of Pennsylvania. Bodcaw instituted this suit in the Lafayette Chancery Court against Atlantic to cancel a 1942 oil and gas lease, and also a 1943 contract covering the SW¼ of Sec. 32, Twp. 17 South, Range 23 West in Lafayette County, Arkansas. After an extensive hearing, the chan-

cellor entered a decree dismissing Bodcaw's complaint for want of equity and quieting Atlantic's title under the 1942 lease, as modified by the 1943 contract.

For many years prior to 1936 the Bodcaw Lumber Company of Louisiana, Inc., engaged extensively in the lumber and sawmill business, and owned large tracts of timbered lands in northern Louisiana and southwest Arkansas. On May 14, 1936, the lumber company sold its Arkansas timbered lands to Union Sawmill Company under a deed reserving the minerals in the grantor. In December, 1941, Bodcaw Lumber Company conveyed said minerals to its stockholders.

When Bodcaw was organized in January, 1942, the stockholders of the lumber company conveyed the minerals reserved in the 1936 deed, including the minerals on the tract in controversy, to Bodcaw in consideration of the issuance to the grantors of 6,000 shares of stock in the new corporation. Thus, the stockholders of the lumber company became the stockholders of Bodcaw. J. A. Buchanan, who was one of the organizers of the lumber company and served as its president from 1922, was elected president of Bodcaw. H. N. Ferguson, who was secretary and a director of the lumber company, also became secretary of Bodcaw. B. S. Cook also continued as a director of the new corporation.

In December, 1939, Bodcaw Lumber Co. executed to Atlantic an oil and gas lease on 1,120 acres in Lafayette County, Arkansas. This lease was executed on behalf of the lumber company by J. A. Buchanan, President, and was atttested by B. S. Cook, who was then Secretary. In making the lease, the lumber company reserved one 40-acre tract out of each quarter-section. Acting under this lease, Atlantic drilled its Bodcaw No. 1 as the discovery well in the McKamie Field, sometimes referred to as McKamie-Patton Field.

The Arkansas Oil & Gas Commission, upon assuming jurisdiction over the new field, required that only one well be drilled on each quarter-section of land. This regulation required Atlantic to pool its three 40-acre tracts in each quarter-section, with the forty reserved by the

lumber company. The pooling arrangement was accomplished by the execution of eight unitization and operating agreements between the lumber company and Atlantic, under which the former was to receive the normal ⅛th royalty. In seven of the unitized areas the lumber company was to also own ¼ and Atlantic ¾ of the ⅞ths "working interest." In the unitized area immediately north of the 160-acre tract in controversy the lumber company and Atlantic each own ½ of the ⅞ths "working interest." Atlantic was the operator under the several instruments and eight of the nine wells drilled were producers. The eight unitization and operating agreements were executed on behalf of the lumber company by J. A. Buchanan, President, and H. N. Ferguson, Secretary, without prior specific authorization of the Board of Directors of the corporation.

On December 10, 1941, Bodcaw Lumber Co., through Buchanan and Ferguson, President and Secretary respectively, executed an oil and gas lease to Atlantic on the S½ of SE¼ of said Sec. 32. Atlantic was unable to agree upon a unitization with the owner of the minerals underlying the N½ of said quarter-section; for that reason Bodcaw, which had become the successor in title to the mineral interests of the lumber company, on June 3, 1942, executed to Atlantic an oil and gas lease covering the 160-acre tract in controversy. This lease was executed on behalf of Bodcaw by J. A. Buchanan, President, and H. N. Ferguson, Secretary, without previous specific authorization by the Board of Directors, It was for a primary term of one year and required payment of ⅜ths royalty to Bodcaw.

On October 19, 1942, Atlantic completed a producing well, known as Bodcaw No. 10, on the 160-acre tract. The well ceased producing on December 10, 1942, having produced less than 2,500 barrels of oil. Atlantic commenced reworking operations on March 25, 1943, in an unsuccessful effort to recomplete the well as a producer in the Smackover Lime formation. Further efforts to make a commercial producer in formations above the Smackover Lime were also unsuccessful.

Atlantic's district superintendent of production, at Magnolia, Arkansas, was ordered by the general superintendent to plug and abandon the well. Before this order was carried out, however, the district superintendent was advised to hold the matter in abeyance, as negotiations were pending with Bodcaw whereby the well might be converted to a salt water disposal well. Thereafter, the district superintendent was advised that such agreement had been reached with Bodcaw; and the well was completed as a salt water disposal well on April 21, 1943, at an expense to Atlantic of $2,388.15. Atlantic also left in the well 4,120 feet of 5½-inch casing which otherwise might have been recovered. No further work has been done on the well since its completion as a salt water disposal well. The total cost to Atlantic of the well was more than $98,000.

Bodcaw, as Lessor, and Atlantic, as Lessee, executed the agreement, dated April 27, 1943, which is the instrument primarily involved in this suit. The instrument was actually executed by Bodcaw on April 29, 1943, which was eight days after the well had already been converted to a salt water disposal well; however, the testimony shows that an agreement had been reached as to its terms prior to conversion of the well.

The agreement recites the sale by Bodcaw Lumber Co. of certain described lands in Lafayette County to Union Sawmill Co. on May 14, 1936, under the deed reserving the minerals in the lumber company; that certain of the lands were being operated by Atlantic for the production of oil and gas; that Bodcaw was the owner of all the interest of the lumber company in said lands, including the 160-acre tract in controversy, "which is now under lease to the Atlantic Refining Co., as evidenced by instrument dated June 3, 1942"; that Atlantic had obtained production from the well known as Bodcaw No. 10 on said tract, which production has ceased. The agreement continues:

"Whereas, the parties hereto now desire that said well above described be used as a salt water injection well in and through which may be injected into certain stra-

tum or strata and horizon or horizons salt water produced from wells located or to be located upon the lands first herein described and the parties hereto desire further that the lease above referred to and recorded in Volume M-7 at Page 523 of the Records of Lafayette County, Arkansas, be reinstated and continue and remain in full force and effect as hereinafter provided.

"Now, therefore, for and in consideration of the premises and the mutual benefits to be derived by the parties hereto, LESSOR has granted, demised, leased and let and by these presents does grant, demise, lease and let unto LESSEE, its successors and assigns, the said southwest quarter (SW¼) of section 32, township 17 south, range 23 west, Lafayette County, Arkansas, for the purpose of injecting, as hereinafter provided, in and through the well situated thereon and such wells hereafter drilled for that purpose, salt water produced from wells located or to be located upon the lands first herein described, together with all rights of whatever kind or nature, incident or necessary to such salt water injection, and also for the purpose and upon the same terms and conditions as set out in the above described oil and gas lease recorded in Volume M-7 at Page 523 of the Records of Lafayette County, Arkansas, as the same is hereby amended. The right is hereby granted unto LESSEE to inject into the above mentioned well the above mentioned salt water in any formation or formations underlying said land as may, in the judgment of LESSEE, most efficiently and economically dispose of the salt water produced from operations upon the lands first above described, with the full right in LESSEE to perform any and all operations in and at said disposal well as may be necessary in connection with the operation thereof for the above mentioned purposes, which operations shall include (but shall not be limited to) the right to deepen such well or drill additional wells if, in the judgment of LESSEE, such deepening operations or additional wells are necessary for the disposal of the above mentioned salt water. This lease shall take effect at once and shall be and remain in full force and effect so long as oil and gas, or either of them, is being produced from the lands

first hereinabove described, or any part of them, by LESSEE, its successors or assigns, under all or any one or more of the oil and gas leases and operating contracts, now existing and which may hereafter be entered into, between LESSEE AND BODCAW LUMBER COMPANY OF LOUISIANA, INC., and BODCAW OIL COMPANY, INC., or either of them and so long as the above mentioned oil and gas leases and operating contracts, or any of them, together with any extensions or renewals thereof, shall remain in force and effect either in whole or in part.

"During the term hereof LESSEE shall not be obligated, either expressly or impliedly, to pay any delay rentals, produce any oil or gas from the southwest quarter (SW¼) of section 32, township 17 south, range 23 west, Lafayette County, Arkansas, or drill any well or wells thereon for that purpose, in order to keep this lease in full force and effect, anything contained in the above mentioned oil and gas lease of June 3, 1942, recorded in Volume M-7 at Page 523 of the Records of Lafayette County, Arkansas, to the contrary notwithstanding . . . "

The above-mentioned agreement was executed on behalf of Bodcaw by J. A. Buchanan, President, and H. N. Ferguson, Secretary, who were also Directors, without previous specific authorization by the Board of Directors. The instrument was notarized by B. S. Cook, a third member of the five-member Board of Directors. At the time the agreement was executed the parties jointly owned the "working interest" in eight producing wells in the McKamie Field, located on lands adjoining the 160-acre tract in controversy on the north. One of these wells directly "offsets" the 160-acre tract. There were fifteen or twenty other producing wells in the field owned and operated by others.

It seems to be undisputed that in 1943 it was the belief of the operators, and their engineers, that the McKamie Field was what is known as a salt water driven field—that is, that the energy which produced the pressure came from a salt water drive. This is evidenced by the fact that Atlantic and Carter Oil Co., principal oper-

ators in the field, had constructed a $2,000,000 desulphur-- ization plant to process and render marketable the "sour" gas produced in the field. It was also shown that if the operators had known that the field was in fact a gas driven field, instead of processing and marketing the gas, they would have reinjected it into the producing formation to maintain the pressure which caused the wells to flow. It was also shown that one of the modern methods of disposing of salt water produced in quantities was to reinject it into a salt water producing stratum by use of a disposal well.

In the latter part of 1945, or early part of 1946, it became obvious to the engineers that the McKamie Field had a gas drive, instead of a salt water drive; that the gas pressure was declining; and that it would be necessary to reinject the gas produced into the producing formation and unitize the whole producing area in order to maintain the gas pressure. A unitization agreement was finally reached by the operators and royalty owners in August, 1948, after this suit was filed on March 1, 1948. The north 100 acres of the tract in controversy was included in the unit, and thus became one of the properties participating in the proceeds from the production of the whole unit. If the lease and contract under attack are invalidated, Bodcaw would thus be entitled to all of the production proceeds allotted to the tract, instead of the ⅜ths royalty provided for in the 1942 lease, as amended by the 1943 contract.

J. A. Buchanan disposed of his Bodcaw stock some time prior to the April 2, 1945, meeting of stockholders and died in October, 1945. Dr. J. S. Seegers, who previously had been a director, was elected President at the 1945 meeting; and his son-in-law, John W. O'Boyle, was also elected a director. H. N. Ferguson suffered a hunting accident in November, 1943, which rendered him mentally incapable of appearing as a witness at the trial. In August, 1946, James D. Heldt was elected Secretary and Treasurer of Bodcaw.

The present officers of Bodcaw testified that some time prior to the time that the necessity of unitization of

the McKamie Field became apparent, they had concluded that the oil and gas lease on the tract in controversy had expired, and the lease and contract had been so marked. Atlantic had no notice of such claim until unitization negotiations were being conducted in 1947. On September 23, 1947, Bodcaw's Secretary wrote Atlantic that the 1942 lease had expired and had been abandoned and forfeited by Atlantic; and that the 1943 agreement was void for lack of consideration.

After the dispute arose, the parties agreed that production proceeds allotted to the tract in controversy should be withheld, pending the outcome of this suit, without prejudice to the rights of either party; and it was so stipulated in the final unitization agreement. Bodcaw has made no effort to lease or further develop the 160 acres in controversy since 1943; and neither party has since that time considered it advisable or prudent to attempt further development of the tract for oil and gas.

We have outlined the facts in considerable detail because we think a consideration of the surrounding circumstances and conditions important in determining the issues on this appeal.

■ Bodcaw first contends that the agreement of April 27, 1943, was invalid for lack of consideration and want of mutuality. It is argued that, although the contract grants Atlantic the right to use the tract of land and the salt water disposal well, the contract imposes no duty or obligation of any kind upon Atlantic; that the agreement does not recite the payment of any consideration and none was paid; and that the contract is, therefore, unilateral, without consideration and void.

Bodcaw relies on such cases as *Grayling Lumber Co.* v. *Hemingway*, 124 Ark. 354, 187 S. W. 327; and *Harrison* v. *Kelly*, 212 Ark. 447, 206 S. W. 2d 184, which state the elementary rule that an agreement entered into between parties to a contract must be mutual in order to be binding, and if it appears that the one party never was bound on his part to do the act which forms the consideration for the promise of the other, the agreement is void for want of mutuality. At the time the contract was executed

the parties jointly owned the eight wells north of the tract in controversy which were then and are still being operated by Atlantic in the production of oil for the mutual benefit of the parties. It is also clear that at that time the parties thought the well which had failed as an oil producer would be useful in the disposal of salt water from the producing lands, and they mutually agreed that it should be used for that purpose and for their mutual benefit and profit. This contemplated use of the well was thus specifically recited in the contract and was recognized by the parties in the contract as mutually beneficial.

The parties further specifically and mutually agreed to continue the oil and gas lease of June 3, 1942, as amended by the 1943 agreement, in full force and effect so long as oil and gas is being produced from the lands already in production. We hold that the mutual benefit thus recognized and contemplated by the parties by conversion and use of the well as a salt water disposal well afforded a sufficient consideration to support the 1943 agreement.

We have also held that where there is a mutual agreement to modify a contract the mutual promises of the parties constitute a sufficient consideration for a valid agreement. *Elkins* v. *Aliceville*, 170 Ark. 195, 279 S. W. 379; *Afflick* v. *Lambert*, 187 Ark. 416, 60 S. W. 2d 176.

If the 1943 agreement be considered as an original contract, and not amendatory to the 1942 lease, we conclude there was also sufficient consideration shown by Atlantic's expenditure of more than $2,300 in converting the well into a salt water disposal well and the leaving by Atlantic of valuable casing in the well which otherwise might have been removed and salvaged. We have frequently held that parol testimony is admissible for the purpose of showing the real consideration in a deed or other writing evidencing a contract where such testimony does not contradict the terms of the written instrument. *Cox* v. *Smith*, 99 Ark. 218, 138 S. W. 978. It is true that the well was converted to a salt water disposal well after an oral agreement had been reached by the parties and

before the written agreement was actually signed, but it was done in contemplation of the written agreement. Evidence of these acts on the part of Atlantic acting under the oral agreement does not in any manner contradict the terms of the written contract, but on the contrary tends to explain and lend substance to said agreement.

It is true that the written contract does not contain an express agreement that Atlantic should forbear the exercise of its legal right to remove the casing from the well, but there are circumstances from which such agreement to forbear is clearly to be implied. *Federal Compress & Warehouse Co.* v. *Hall,* 209 Ark. 274, 189 S. W. 2d 922. Atlantic refrained from exercising its legal right under the 1942 lease to salvage the casing upon abandoning the well as an oil producer and this was additional consideration for the 1943 agreement. We, therefore, conclude that the 1943 contract is supported by sufficient consideration and that it is not lacking in mutuality.

■ It is next insisted that, if the April, 1943, agreement is valid, it revived the 1942 lease only until June 3, 1943. It is argued that the 1942 lease had already expired by its own terms when the agreement was executed on April 27, 1943, in view of a provision of the 1942 lease to the effect that it would not terminate if lessee commenced drilling or reworking operations within 60 days after production should cease. The contention is that since reworking operations were not commenced until March 25, 1943, which was more than 60 days after production ceased on December 10, 1942, the 1942 lease had by its own terms expired prior to execution of the agreement of April 27, 1943.

There are other provisions of the 1942 lease which suggest a conclusion different from the one urged by appellant, but we find it unnecessary to discuss these in view of the plain and unambiguous provisions of the 1943 agreement. This agreement affirmatively recognizes the existence of the 1942 lease and specifically provides that it shall, "be reinstated and continue and remain in full force and effect," as amended by the 1943 agreement, so long as oil and gas, or either of them, is being produced

from the other lands described in the agreement, which include the wells the parties own jointly. The surrounding facts and circumstances, as well as the express and unambiguous provisions of the 1943 agreement, refute the proposition that the parties intended that the 1942 oil and gas lease should terminate only 36 days after the execution of the 1943 agreement.

The lease and 1943 agreement were prepared by attorneys for Atlantic. Bodcaw thus invokes the familiar rules that a contract should be construed most strongly against the party preparing it and that oil and gas leases are to be construed in favor of the lessor and against the lessee. We agree with the trial court's finding that these rules are to be applied where the contract is susceptible to different interpretations, but should not be used to overturn the plain and unambiguous terms of the contract.

■ It is next contended that Atlantic has abandoned and forfeited its rights to produce oil and gas from the 160-acre tract in controversy. Many cases are cited which deal with the implied duty of the lessee to explore and develop the leased premises. It is insisted that the uncontradicted evidence conclusively shows that Atlantic long ago abandoned its right to produce oil and gas from the tract in controversy. We cannot agree with this contention. An implied covenant to explore and develop the leased premises is read into an oil and gas lease by the courts for the purpose of carrying out the intent of the parties to the contract, when it is necessary to attain the object and purpose of such contract. One of the leading cases in this state on abandonment and forfeiture is that of *Ezzell* v. *Oil Associates, Inc.*, 180 Ark. 802, 22 S. W. 2d 1015. There the court approved the following rules stated by the textwriter in 11 L. R. A., N. S. 417: "Generally all leases of land for the exploration and development of minerals are executed by the lessor in the hope and upon the condition, either express or implied, that the land shall be developed for minerals; and it would be unjust and unreasonable, and contravene the nature and spirit of the lease, to allow the lessee to

continue to hold under it any considerable length of time without making any effort at all to develop it according to the express or implied purpose of the lease; and, in general, while equity abhors a forfeiture, yet, when such a forfeiture works equity, and is essential to public and private interests in the development of minerals in land, the landowner, as well as the public, will be protected from the laches of the lessee and the forfeiture of the lease allowed, where such forfeiture does not contravene plain and unambiguous stipulations in the lease. This principle will be more readily enforced and applied by the court as to gas and oil cases, because of the peculiar nature of those minerals, and the danger of entire loss to the lessor of oil or gas in his lands by reason of well drilling on adjacent lands.''

The court further said: ''In Ann. Cas. 1917E, p. 1126, it is said: that in oil and gas leases, where the owner of the land leases the same for a nominal sum and the further consideration of a royalty or a percentage of the profits realized by the lessee in working and developing the land, in the absence of an express agreement, there is an implied covenant that the lessee will use reasonable diligence in commencing and continuing operations. Numerous cases are cited which support the rule.''

The question here is whether an implied covenant to further explore and develop the tract in controversy will be read into the 1943 agreement in the face of the last paragraph of the agreement hereinbefore quoted. It is true that Atlantic had abandoned the Bodcaw No. 10 well as a producer of oil prior to the execution of the 1943 contract, but this does not mean it had also abandoned the 1942 lease. The fact that the well itself had already been abandoned as a producer of oil and that neither party at that time believed that the drilling of another well was justified tends to explain the reasons for the terms of the 1943 agreement.

The question of abandonment is a mixed one of law and fact and each case must depend upon its own particular facts and circumstances. *Millar* v. *Mauney,* 150

Ark. 161, 234 S. W. 498; *Ezzell* v. *Oil Associates, Inc.,*
*supra.* If Bodcaw thought it advisable to further de-
velop and drill the tract it has never so indicated by
demanding performance or compliance with any alleged
implied covenant to do so. Under the facts and circum-
stances presented in this record, we cannot say that it
was either in the public interest or the interest of the
parties to the contract that the tract in controversy
should have been further developed and explored for gas
and oil. To hold that an implied covenant to do so should
be read into the lease, as amended by the 1943 agree-
ment, would be in absolute contradition of the express
terms of the agreement.

There are many cases from other jurisdictions which
deny the existence of an implied covenant to explore
and drill under somewhat similar circumstances. Some
of these are *Simms Oil Company* v. *Flewellen,* 138 Tex.
63, 156 S. W. 2d 521; *Shell Petroleum Corp.* v. *Shore,* 72
Fed. 2d 193; *Danciger Oil & Refining Co.* v. *Powell,* 137
Tex. 484, 154 S. W. 2d 632, 137 A. L. R. 408. None of the
Arkansas cases cited by Bodcaw involve contracts or
leases which contain express stipulations to the effect
that the lessee "shall not be obligated either expressly or
impliedly to . . . produce any oil or gas . . . or
drill any well or wells thereon for that purpose in order
to keep this lease in full force and effect." Under the
facts and circumstances here, we do not feel warranted
in reading into the lease and agreement an intention
directly opposite to that expressed by the parties.

▮ Bodcaw next argues that the 1943 agreement is
not binding upon it because J. A. Buchanan had neither
actual nor apparent authority to execute it. In his find-
ings the chancellor said: "At least one of the witnesses
testifying for the plaintiff in this action stated that
Mr. J. A. Buchanan, the president of plaintiff company,
was indeed a very shrewd business man, and no doubt
the members of the corporation, of which he was presi-
dent, so regarded him; and from the facts and circum-
stances introduced in evidence in this case they relied on
him to protect the interest of the corporation in all con-
tracts executed by him as president; and neither the

Board of Directors or the stockholders ever at any time questioned any contract signed by him as president of the corporation. . . .

"The court finds that the act of the president and secretary, in the execution of the contract, Exhibit 'B', was impliedly ratified by the Board of Directors by acquiescence in many other contracts of similar nature executed by said president and secretary without prior authority to do so; and that said Exhibit 'B' was ratified by implication by plaintiff's long acquiescence in the obligations of said contract."

We concur in this conclusion and hold that J. A. Buchanan acted within the scope of his implied authority in executing the 1943 agreement. As previously stated, the agreement was signed by J. A. Buchanan, president and general manager, and attested by H. N. Ferguson, Secretary. It was acknowledged before B. S. Cook, director, and executed with the knowledge of a fourth member of the five-member board of directors of Bodcaw. We have heretofore mentioned a few of the many contracts which J. A. Buchanan executed over the years as president of both Bodcaw Lumber Co. and appellant without prior authorization of the board of directors. The by-laws of Bodcaw made its president general manager of the corporation. As one director who had served with him over the years stated, Buchanan was the "big boss" of Bodcaw. As president of Bodcaw, he continued to act for the new corporation in the execution of contracts and conveyances without prior authorization by the board of directors in the same manner that was done during the years that he was president of the lumber company. All of such acts were either acquiesced in by the corporation or readily ratified by the board of directors upon request and none of them were ever questioned except the contract in controversy here, and there has been no action by the board refusing to ratify it.

In *Texarkana & Fort Smith Railway Co.* v. *Bemis Lumber Co.*, 67 Ark. 542, 55 S. W. 944, the president of a corporation had been accustomed to executing promis-

sory notes in the name of the corporation without express authority of its board of directors, of which custom the board was cognizant. We held that the corporation was bound by a note so signed by the president and said: "The board of directors must be held, under the circumstances, to have acquiesced, and the corporation was bound for the same, as though the board of directors had, by formal action, conferred upon the president express authority to make the note. *Estes* v. *German National Bank*, 62 Ark. 7, 34 S. W. 85; *City Electric Ry. Co.* v. *First National Bank*, 62 Ark. 33, 34 S. W. 89, 31 L. R. A. 535, 54 Am. St. Rep. 282; *Mining Co.* v. *Anglo-Californian Bank*, 104 U. S. 192, 26 L. Ed. 707." See, also, *Winer* v. *Bank of Blytheville*, 89 Ark. 435, 117 S. W. 232, 131 Am. St. Rep. 102; *International Life Insurance Co.* v. *Vaughn*, 114 Ark. 26, 169 S. W. 330; 2 C. J. S., Agency, § 99. It is clear from the evidence in the case at bar that the board of directors of Bodcaw by its conduct and acquiescence depended and relied upon J. A. Buchanan in the negotiation and execution of all its contracts without previous authorization. Buchanan was thus clothed with the power and authority to execute the agreement in controversy as fully as if the board had formally and expressly granted such authority.

■ Bodcaw next argues that it could not validly grant Atlantic the right to inject salt water into the quarter-section of land in controversy and the 1943 agreement, therefore, fails. The contention is that Bodcaw disposed of the surface rights in the land in 1936; that disposal of salt water by use of a disposal well was unknown at that time and Bodcaw retained no such right of disposal by reservation of the minerals and, therefore, could not assign or transfer such right to Atlantic under our holding in *Missouri Pacific Rd. Co.* v. *Strohacker*, 202 Ark. 645, 152 S. W. 2d 557, and similar cases. We find it unnecessary to determine whether Bodcaw reserved the right to inject salt water into the ground under the deed. The owner of the surface rights is not a party to this suit and, insofar as the record here discloses, has made no claim to the right assigned by Bodcaw. It seems certain that both parties thought and

supposed that Bodcaw had the right to assign the right of salt water disposal by injection into the ground at the time the 1943 agreement was entered into.

In discussing "Assignment of a supposed right as consideration" in Williston on Contracts (Rev. Ed.) Vol. I, § 137, the learned author says: "Somewhat analogous to the surrender of a supposed claim as consideration for a promise is the assignment of a supposed right of another kind. Certainly if the parties confessedly bargain for the assignment of such right as the grantee may have, be it small or great, or none at all, the assignment in fact is sufficient consideration for a promise though it turns out that there is no right transferred. The only possible exception to such a rule is that, if no reasonable person could suppose the assigned chance was of any value, it might then be insufficient consideration. But even in such a case the execution of a quit claim deed or other desired paper would support a promise." See, also, Restatement, Contracts, § 177; *St. Francis Levee Dist.* v. *Cottonwood Lbr. Co.*, 86 Ark. 221, 110 S. W. 805; *Jonesboro Hdwe. Co.* v. *Western Tie & Timber Co.*, 134 Ark. 543, 204 S. W. 418. The facts here do not bring the assumed right of salt water disposal within the "possible exception" to the rule thus stated; and the assignment of such supposed right is sufficient consideration for the 1943 agreement. Moreover, the record shows that the tract in controversy has materially increased in value since the north 100 acres was included in the 1948 unitization agreement and, insofar as Atlantic's rights are concerned, it would be manifestly inequitable for Bodcaw to now be permitted to say that it was without authority to grant a right so clearly intended and for which Atlantic paid a valuable consideration.

Since we conclude that the 1943 agreement is valid and binding and not subject to cancellation by Bodcaw, it is unnecessary to determine whether the cause of action is barred by laches. The decree of the trial court is in all things correct and is, therefore, affirmed.