JULIAN JAMES STORES, INC. v.
BOB G. BENNETT

5-5509                                    465 S. W. 2d 94

Opinion delivered March 29, 1971
[Rehearing denied April 26, 1971.]

*Douglas Bradley,* for appellant.

*Lee Ward,* for appellee.

GEORGE ROSE SMITH, Justice. The appellee, a real estate broker brought this action to recover a $3,500 commission which he had assertedly earned by finding a purchaser for a 31-acre farm being offered for sale by the appellant, a family corporation owned by Julian James and his wife. This appeal is from a $3,500 verdict and

judgment for the plaintiff. For reversal it is contended that the plaintiff's proof was fatally deficient in four particulars.

We state the facts most favorably to the appellee, as is our rule. On a Wednesday morning, June 18, 1969, Bennett and Julian James happened to meet at the post office in Jonesboro. James orally employed Bennett to sell the farm for $33,000, with the down payment to be $15,000 and the balance to be paid in five years, at 7½% interest. In response to a question Bennett stated that he thought that Wallace Fowler would be interested in buying the property.

On Thursday and Friday Bennett discussed the farm with Fowler and showed it to him. Fowler was interested but wanted easier credit terms. On Friday Bennett talked again with James, who raised the price to $35,000 but reduced the. down payment to $7,500 and extended the period of credit to fifteen years. On Saturday morning Fowler agreed to the new terms. That afternoon Bennett telephoned James and reported that he had sold the land to Fowler upon James's exact terms. James replied: "That's great, Bob. . . . You've done a good job."

On Monday morning Bennett received this letter from James, dated the preceding Saturday:-

> Since I talked to you today, I have discussed, in detail, the possibility of selling the acreage out by Craighead Forest, with the family, and several things have developed, that has caused us to not sell the property at this time.

> From all indications another deal for another piece of property is going to go thru, and if it does, we think it best to hold this acreage, for it might be best to sell it off in lots.

> Your interest in selling it and helping us is sincerely appreciated. If and when we decide to think of selling it, we will be glad to talk to you first.

When Bennett called James on Monday morning to express his surprise and disappointment at James's change of position, James said that his wife wouldn't let him sell the property. Despite James's written statement that he and his family had decided not to sell the property, on June 25—only two days later—James and his wife sent Bennett a letter offering him an exclusive listing to sell the property for $37,500. In that letter Mr. and Mrs. James stated that they would like to see Bennett's client (Fowler) get the property and explained that the new price was a compromise between what James had discussed with Bennett and what Mrs. James wanted for the property. Later on this action was filed, resulting in a verdict for Bennett for the full 10% commission.

The appellant corporation now relies upon four asserted deficiencies in Bennett's proof to justify its refusal to pay Bennett's commission. Not one of those grounds for refusal was asserted in James's about-face letter of Saturday, June 21. Consequently the appellant is confronted with the settled rule that a seller who has attempted to revoke his earlier acceptance of an offer obtained by the broker cannot ordinarily defeat the latter's claim to his commission upon a ground not originally stated as a basis for the revocation. This introductory statement to an A. L. R. annotation fits the case at bar so precisely that it is well worth quoting:

> For example, in a case where a landowner has listed property for sale with a broker, and the latter has procured an oral offer from a prospect so easily that the owner concludes he should have asked more for the property, for which reason he rejects the offer and gives the standard excuse that his wife will not let him sell, or he frankly states that he wants more money, a question arises as to whether he may later defend the broker's action for commissions or other compensation by asserting other matters not discussed when refusing the offer, such as [several illustrative excuses stated]. As will be seen in III, infra, as a general rule, none of these matters may be raised as a defense under such circumstances. [156 A. L. R. 602.]

The foregoing principle of waiver applies to the first three of the grounds now relied upon by the appellant for a reversal of the judgment. For that reason we need discuss those contentions only briefly.

First, it is argued, on the basis of dictum contained in a footnote in *Cherry* v. *Montgomery*, 242 Ark. 233, 412 S. W: 2d 845 (1967), that a broker does not earn his commission if the purchaser's oral offer is made to the broker rather than to the seller himself. That rule prevails in California, as an incident to the statute of frauds. *Mattingly* v. *Pennie*, 105 Cal. 514, 39 Pac. 200, 45 A. S. R. 87 (1895). The rule has never been followed in Arkansas, and, moreover, it does not apply even in California when, as in the case at bar, the seller waives the rule by preventing the broker from bringing the parties face to face. *Martin* v. *Culver Enterprises*, 49 Cal. Rptr. 149 (Cal. App., 1966).

Secondly, it is contended that Bennett did not prove Julian James's authority to act for the family corporation. Bennett showed, however, without contradiction, that James and his wife owned 494 of the corporation's 500 outstanding shares of stock and that James was the president of the company. To allow such a one-man corporation to avoid its owner's contract would be a fraud. *Security Bank & Tr. Co.* v. *Warren Light & Water Co.*, 170 Ark. 50, 278 S. W. 643 (1925). Furthermore, here the corporation perforce relies upon James's letter of June 21, revoking the contract, but that letter was signed by James as an individual. Finally, the principle of waiver, already mentioned, obviously applies here, for if Mr. and Mrs. James had been sincere about wanting to sell the property upon the terms accepted by Fowler, they could readily have supplied the necessary corporate resolution.

Thirdly, it is argued that the appellant never agreed to an offer of $1,000 earnest money that accompanied a written acceptance signed by Fowler on Monday, June 23. A complete answer to that contention is that James's terms of sale made no mention whatever of any earnest money. A seller certainly cannot complain of a provi-

sion in the buyer's acceptance more generous to the seller than what the latter had demanded.

Finally, the appellant, again citing *Cherry, supra,* argues that Bennett did not prove that the purchaser, Fowler, was financially able to make the purchase. We do not imply that the doctrine of waiver applies to this contention, for some authorities recognize an exception to that doctrine when the seller's belated objection is based upon a matter that the broker could not have cured even if the objection had been brought to his attention. 156 A. L. R. 604. But here, unlike the fact situation in *Cherry* v. *Montgomery,* the uncontradicted proof is that Fowler, the buyer, was financially able to make the purchase. Fowler testified that he was in the retail furniture business, that he owned a farm, and that he was interested in other businesses, which he named. He stated positively that he had been financially able to go through with the contract. On cross examination he said that he had the funds to make the $7,500 down payment, without having to borrow any money. It will also be remembered that on June 25 Mr. and Mrs. James stated in their letter to Bennett that they hoped that Fowler would be the purchaser of the property at the increased price of $37,500. Thus there was an abundance of substantial evidence to support the jury's verdict upon this issue.

Affirmed.

HARRIS, C. J., and FOGLEMAN, J., dissent.

JOHN A. FOGLEMAN, Justice, dissenting. I respectfully dissent because I think the court has capriciously pierced the corporate veil in holding that the evidence showed that Julian James had the authority to employ a real estate agent to sell corporate assets. I humbly submit that the case cited constitutes no authority for the majority's position. In that case (*Security Bank & Trust Co.* v. *Warren Light & Water Co.,* 170 Ark. 50, 278 S. W. 643), the evidence showed that one individual, S. R. Morgan, controlled and directed the affairs of the corporation, and the officers of the corporation obeyed

his orders. Morgan handled the funds and *completely dominated* the firm. Bonds of the company and a mortgage securing them were the subject of the litigation. They were signed and impressed with the corporate seal by the president and secretary of the corporation, pursuant to resolution of the directors, and put into Morgan's hands. Morgan negotiated a loan and pledged the bonds, representing that they were valid, binding obligations, notwithstanding the fact that they had not been authorized by the Arkansas Corporation Commission or countersigned by the trustee. Then, without recording the mortgage, the corporation sold its corporate property to Morgan & Co., which was actually S. R. Morgan. The court treated the corporation as a partnership and properly said that Morgan and his associates were clearly estopped by Morgan's representations to deny liability on the notes or to repudiate the mortgage. None of the essential facts is present here. There is nothing to show that Julian James dominated the corporation or controlled or directed its affairs, or even his wife, who was the other substantial stockholder. As a matter of fact, the record clearly discloses that Mrs. James had a voice in the affairs of the corporation and used it. The fact that she was willing to authorize a sale at a substantially higher price does not mean that she was willing to, or did, authorize one at the lower price, or the employment of an agent to sell at that price.

Apparently, the majority is treating the husband and wife as an entity, but this fiction was substantially weakened by the Married Women's Acts early in the century. I have reason to entertain serious doubt that it will be revived beyond the reach of this opinion.

I do not see how the letter of a corporate officer as an individual, undoing an unauthorized act, could possibly constitute either evidence of his authority or ratification of his acts by the corporation. Nor do I find any act whatever on the part of the corporation or Mrs. James to justify the application of the principle of waiver—the voluntary relinquishment of a known right. It is obvious that Mrs. James did not want to sell the property on the terms accepted by Fowler and made herself an obstacle to any corporate resolution to that effect.

James was president and his wife secretary of the corporation. James' authority was governed by Ark. Stat. Ann. § 64-310 (Repl. 1966). It was not shown that there was any corporate by-law or resolution authorizing him to sell the corporate real estate or to employ an agent to do so. The identity of the directors is not disclosed. They have very heavy responsibilities to minority as well as majority stockholders. It is not shown that the directors even knew of the action of James, unless he and his wife are directors. If so, at least one director did not approve. Thus, cases such as *Bodcaw Oil Company, Inc.* v. *Atlantic Refining Company*, 217 Ark. 50, 228 S. W. 2d 626, cannot apply, for there was neither evidence of acquiescence in this transaction nor in similar actions without prior authority. Furthermore, no question of implied authority was submitted to the jury.

The issue as to James' authority was clearly raised by the motion for a directed verdict. The court instructed the jury, over appellant's objection, that James, as president and majority stockholder, had legal authority to bind the corporation. Neither the circuit judge, appellee's counsel nor the majority has come up with any authority for this statement. I submit that the giving of the instruction and the denial of a directed verdict were error. I would reverse the judgment and remand for a new trial. Perhaps appellee can more fully develop the cause to justify a finding of agency.