# E.A. WHITTEN *v.* HAROLD AUSTIN CONSTRUCTION, INC.

CA 95-1326                                             935 S.W.2d 579

Court of Appeals of Arkansas
En Banc
Opinion delivered December 23, 1996

*John Harris Jones*, for appellant.

*Bart Mullis Law Firm,* by: *Bart G. Mullis,* for appellee.

OLLY NEAL, Judge. E.A. Whitten brings this appeal from a Jefferson County Chancery Court order denying his prayer for specific performance of a land-sale contract he allegedly entered into with appellee. The chancellor found that the offer and acceptance upon which appellant's claim is based, was executed on behalf of Harold Austin Construction, Inc., by one of its minority stockholders who lacked authority to bind the corporation. Harold Austin was the majority shareholder of the corporation, holding ninety-five percent (95%) of its stock. We find that the chancellor's findings of fact are not clearly erroneous, supported by substantial evidence and therefore, affirm the judgment.

Appellant alleged in his complaint that on March 24, 1994, appellant, acting through Worthen Trust Company Realty Service, communicated an offer to purchase "farm #2148," a 360-acre farm located in Jefferson County from appellee for the sum of $355,000. The offer recited that its terms would be binding if accepted within three (3) days and was signed by appellant as buyer and by Mark Maxwell, vice-president of Worthen Trust, as agent. The offer was accepted the following day by Sylvia Austin on behalf of Harold Austin Construction, Inc. Sylvia Austin, wife of Harold Austin, owned 5% of the corporation's stock. At all relevant times, Harold Austin was confined to a wheelchair, and in fact, is paralyzed from the neck down.

At the December 8, 1994, trial, testifying on his own behalf, appellant E.A. Whitten recalled that he had made a preliminary offer to purchase a farm from appellee for the sum of $350,000 which was rejected. Appellant also remembered that his second offer was accepted by appellee on March 24, 1993, and that he went to Little Rock, Arkansas, the following day to arrange to pay cash for the acquisition. At the time, Mr. Whitten was not aware that Austin Construction was a corporation, and "presumed [he] was purchasing from Harold Austin and wife." Mr. Whitten stated that he was not aware of any problems with the contract until he was informed by Maxwell several days after it was executed that the Austins were unwilling to consummate the deal. Appellant admitted that he never met the Austins and that he accepted responsibility for paying Maxwell's commission. According to Mr. Whitten, appellant, at all times, considered Maxwell his own agent.

William Mark Maxwell, the Worthen Bank employee who was responsible for all agricultural and real-estate transactions, testified on direct examination that he contacted Harold Austin and talked with Austin about whether Austin was interested in selling the farm. After Mr. Austin indicated that he would consider selling, Maxwell contacted appellant, showed Mr. Whitten the property, and transmitted Whitten's written offer to the Austins. Maxwell testified that his first offer was rejected, and he then conferred with appellant and was authorized to offer a greater price and $5,000 earnest money. The Austins asked Maxwell to wait until the next day. Although he couldn't remember specifically, Mr. Maxwell testified that he believed that Mrs. Austin contacted him the following day and informed him that Austin Construction had decided to accept the second offer of $355,000. Maxwell also admitted that prior to Mrs. Austin's signing the sale contract, Mr. Austin stated that he didn't want to "do the deal." After the contract was signed, Mr. Austin made no further comments. Two days later, Mrs. Austin contacted Maxwell and attempted to back out of the deal.

On cross-examination, Mr. Maxwell stated that Harold Austin was involved in all phases of negotiation of the contract and that Mr. Austin was the person he dealt with. Maxwell never knew that Mrs. Austin was president of the corporation or that she and Mr. Austin comprised the entire board of directors. Maxwell admitted that he never asked for a corporate resolution at the initial execution of the contract, and only decided to do so after he returned to the bank and was asked to secure one by the bank's trust department.

Sylvia Austin testified that she recalled the circumstances surrounding the farm transaction and remembered that Mark Maxwell initiated the deal by contacting her husband and asking him if he was "interested in selling the Roberts place." Upon receiving a somewhat ambiguous, "Oh, I might sell if the price is right," Mr. Maxwell secured an offer and visited the Austins several times, even after the first offer was rejected and Mrs. Austin asked him not to return. After Maxwell's final visit prior to the signing of the contract, Maxwell left the contract with the Austins and the Austins stayed up all night discussing the proposition. Mrs. Austin denied calling Maxwell to confirm the deal, and remembered at trial that, when Maxwell entered the Austin residence the following day, Mr. Austin immediately told the agent, "she's not going to sign them

papers. I don't want to sell that place." Mrs. Austin stated that she accepted the papers and signed them, and Maxwell immediately left the premises. Mrs. Austin admitted that she did not have her husband's permission to sign the final contract, and did so, in direct defiance of her husband's wishes, only because she was "wore out" from staying up the previous night and from dealing with the constant pressure applied by Mr. Maxwell. Mrs. Austin also admitted that she never held herself out as the president of the corporation and only signed some documents as president because Mr. Austin was unable to write.

Harold Austin testified that he specifically communicated to both Mrs. Austin and Mark Maxwell that he did not want to go through with the transaction. Although Mr. Austin had considered accepting appellant's offer, he ultimately decided that the offered price wasn't high enough. According to Mr. Austin, by March 24, 1994, the day the contract was signed, he had completely changed his mind and decided that he didn't want to sell for any price.

It is an established principle of appellate review that we will not reverse a chancellor's finding of fact unless it is clearly erroneous. *Hot Stuff, Inc. v. Kinko's Graphic Corp.*, 50 Ark. App. 56, 901 S.W.2d 854 (1995). *Fennell v. Ross*, 289 Ark. 374, 711 S.W.2d 793 (1986). Appellant here argues first that the chancellor erred as a matter of law when he ruled that Mark Maxwell was the agent of appellant. In the *Fennell* case, the supreme court delineated the relative positions of agents and principals in land sale contract cases. The supreme court held in *Fennell*, that as a matter of law, in all cases involving properties listed with the Multiple Listing Service the listing agent is conclusively the subagent of the seller. However, in the instant case, appellant's reliance on *Fennell* is misplaced. In framing the issue in *Fennell*, the court stated:

> The [trial] court obviously, and we think correctly, regarded the question of whether [the listing agent] was the agent of the sellers or of the buyers as one of law. That is the question his decision turned upon, and it is thus the one we must address. Here we are dealing with a garden variety MLS property sale transaction conducted by two real estate broker through their agents. Obviously, the broker and agent who listed the property with MLS was the representative of the sellers, but what of the others...

*Id.* at 377.

■ The court concluded:

> The law of agency contemplates that an agent may serve only one principal with respect to any one transaction (citation omitted). We agree with the authorities and authors cited above who have reached the conclusion that in an MLS transaction like this one the selling agent is a subagent of the sellers.

*Id.* at 379.

■ The court's limitation of its holding to MLS cases is based on sound reasoning. In what the court described as "garden variety MLS" cases, the potential seller clearly evinces an intent to sell his property by listing the property with multiple agencies: by signing a listing contract the seller in effect states, "I will pay you if you will find a buyer for my property at a fair price." Under such an arrangement, it is the seller who pays the listing agent for his services and ultimately he who benefits from any transaction. The listing agency and subagent obviously work on behalf of the seller. In cases such as the one before us, where the property is never listed for sale and the owner of the property does nothing to indicate that he wishes to sell his property, the rationale for holding the selling agent as his subagent as a matter of law is somewhat dubious. Under this type of arrangement, the agent may actually be the person who initiates the sale for the purpose of collecting a commission, or the buyer may solicit the assistance of an agent to secure property for himself at a below-market price. In both instances, it would be irrational to hold that the real estate agent represents the seller. The court recognized in *Fennell* that selling agents in MLS cases are somewhat constrained by their legal duty to the seller and may only serve one principal per transaction.

■ In non-MLS cases, the general rule remains that the existence of the agency relationship may be established by the testimony of other witnesses who possess knowledge of the facts, that circumstantial evidence may be sufficient to establish the agency, and that the agent's declarations may be used to corroborate other evidence of agency. *See Hawthorne* v. *Davis,* 268 Ark. 131, 594 S.W.2d 844 (1980). Also, an owner or seller must do some affirmative act that tends to prove he accepted the broker as his agent; mere selling to the party whom the broker procured is insufficient proof.

*Walker* v. *Huckabee,* 10 Ark. 165, 661 S.W.2d 460 (1983).

█ In the case at bar, the chancellor found that Maxwell acted as the buyer's agent in the transaction. The supreme court's ruling in *Fennell, supra* does not preclude that finding as a matter of law as this is not an MLS case. Mr. and Mrs. Austin's testimony that Mr. Austin clearly communicated to both Mrs. Austin and Mr. Maxwell that he did not wish to sell his property, appellant's testimony that it was he who was to pay Maxwell's commission, and Maxwell's testimony that he actively solicited the sale are all circumstantial evidence of an agency relationship between appellant and Maxwell and is contrary to a finding that the Austins accepted Maxwell as their agent.

█ Appellant also argues that the chancellor erred in its finding that Mrs. Austin was acting within the scope of her apparent authority when she signed the contract and, therefore, her principal, Harold Austin Construction, Inc., should be bound by her actions. That argument is without merit. Mr. Maxwell, appellant's agent, as well as appellant himself, admitted that at the time of the transaction, he had no idea Austin Construction was incorporated or that Mrs. Austin was its president. Maxwell assumed that the Austins jointly owned the farm. That admission, when considered in light of Mr. Maxwell's admission that Mr. Austin clearly stated that he did not want to proceed with the sale forecloses appellant's argument that Mrs. Austin had apparent authority to bind the corporation. Mr. Maxwell, and therefore appellant, his principal, had notice of the restrictions on her ability to unilaterally sell the property in question.

██ Appellant's third argument is that the contract should have been upheld based on principles of ratification or acquiescence. This argument fails for some of the same reasons cited above; the evidence tended to show that Mr. Austin, the majority stockholder in the corporation expressed his opposition to the sale prior to the signing of any documents, and additionally, did no other act consistent with ratification. Ratification may be proved by showing that all the shareholders of a corporation had notice or knowledge of the authorized act of one of its managers or agents, and either expressly consented thereto, or remained silent and took no steps to disaffirm the act within a reasonable time after receiving such notice or knowledge. *M & F Bank* v. *Harris Lumber Co.,* 103 Ark. 287, 146 S.W.2d 510 (1912). The unequivocal testimony at trial established

that Mr. Austin was paralyzed from the neck down, and was unable to so much as pick up a telephone. Under the circumstances, the two-day period that elapsed between the time he informed Mrs. Austin and Mr. Maxwell of his desires and the time Mrs. Austin attempted to rescind her signature was not unreasonable. Mr. Austin had no power to notify anyone outside of his home that the contract was invalid and of necessity had to wait for Mrs. Austin to comply with his wishes. A party's manifestation of assent to a contract is judged objectively and may be proved by circumstantial evidence. *Childs* v. *Adams*, 322 Ark. 424, 909 S.W.2d 641 (1995).

■ Similarly, appellant's arguments asserting waiver and estoppel as a defense must fail. Appellant inappropriately cites *Julian James Stores, Inc.* v. *Bennett*, 250 Ark. 279, 465 S.W.2d 94 (1971), as support for his waiver argument. That case dealt solely with the issue of whether a seller may defeat a broker's's claim to commission by asserting a ground different than the ground originally stated for revoking his acceptance. That case has no application to the present facts as Mr. Maxwell has presumptively received his commission; a selling agent who procures a willing buyer is entitled to his commission regardless of the outcome of the agreement between buyer and seller. *Graham* v. *Crandall*, 11 Ark. App. 109, 688 S.W.2d 548 (1984). Under the circumstances, Mr. Austin, the majority stockholder, cannot be said to have waived the defense of lack of authority.

■ Estoppel applies where an owner of realty "stands by and permits it to be sold, without giving notice of or asserting his rights." *Williams* v. *Davis*, 211 Ark. 725, 202 S.W.2d 205 (1947). There was ample evidence that Mr. Austin expressed his intent not to sell the subject property prior to Mrs. Austin's signing the contract, and he cannot be said to have sat idly by and watched his property sold.

Affirmed.

ROGERS, GRIFFEN, ROBBINS, and PITTMAN, JJ., agree.

STROUD, J., dissents.

JOHN F. STROUD, JR., Judge, dissenting. I respectfully dissent from the majority opinion in this case because it is my view that there was an enforceable contract.

Harold Austin, a quadriplegic, owned 995 shares of the stock

of the appellee company; his wife, Sylvia Austin, owned the remaining five shares. Sylvia Austin signed the offer and acceptance on behalf of the corporation, and it was established that she had signed other instruments for the company as president due to the inability of her husband to sign papers. It was also established that although the corporation was validly formed, no meetings or minutes were ever prepared or placed in the minute book since the organizational meeting twenty years before.

Appellee admitted in its answer that a contract was entered into on March 23, 1994, but denied that it was valid and binding on the corporation. Mr. Maxwell, a realtor, made an initial contact with Mr. Austin and asked if he would sell the 360-acre farm. Mr. Austin indicated he would sell for the right price. After one offer was refused, another offer was presented by the realtor. The Austins asked him to wait a day, and Mr. Maxwell brought out the offer and acceptance on the following day. Mr. Austin said he didn't want to do the deal, but his wife said that was ridiculous and signed the agreement. She made copies, kept the earnest money check, and delivered the signed contract to their realtor. Mr. Austin admitted in his testimony that before Mr. Maxwell left, he asked Mr. Austin, "Are you sure this is what you want to do?" and that Mr. Austin did not respond.

In my opinion, there was a valid contract, and if Mr. Austin did not agree, he at least had the obligation to respond to Mr. Maxwell when he asked if that was what Mr. Austin wanted to do. Failure to make any response to such a pointed question either evidences agreement or acquiescence to the execution of the agreement by the corporation. He obviously knew that the realtor would immediately deliver a fully executed copy of the agreement to the buyer. The testimony was that Mr. and Mrs. Austin argued much of the night before the contract was signed as to whether or not the corporation should sell the farm for the increased offering. The court found that Mr. Austin was mad at his wife, and he felt he was being forced into the transaction. That may be so, but the point is that, forced or not, he did allow the corporation to enter into the agreement. The fact that Mrs. Austin did not deposit the earnest money check, that she called the realtor two days later and left a message that they did not want to sell, or that she testified that it was her belief that she could rescind the agreement within three days are of no consequence except as further evidence that there