KERR *v.* WALKER.

5-1725                                    321 S. W. 2d 220

Opinion delivered February 2, 1959.

*Norton & Norton,* for appellant.

*Harold Sharpe,* for appellee.

GEORGE ROSE SMITH, J. In 1952 Walker employed Kerr to manage Walker's insurance agency at Forrest City for a term of five years. Under the contract Kerr was to receive a weekly salary and an annual bonus. At the end of the first year the parties disagreed about how the bonus should be computed. Kerr eventually filed this suit to recover $3,018.41 as his bonus, and Walker then notified Kerr that he was discharged. The chancellor awarded Kerr $242.66 as his bonus and $600.00 as termination pay that accrued upon his discharge without cause. Both parties have appealed.

The principal issue, that of computing the bonus, is presented by Kerr's direct appeal. In the trial court an accountant was appointed as a master in chancery, to determine the profits of the business during the year in question, and there is very little dispute about the figures that enter into the calculation of the bonus. Instead, the problem concerns the method of calculation and hinges upon the correct interpretation of this paragraph in the contract of employment:

"First party [Walker] agrees to guarantee second party [Kerr] a weekly salary of Seventy ($70.00) Dollars per week and at the end of the first year, and each consecutive year thereafter during the term of this contract, first party further agrees to pay to second party a bonus based on Thirty (30%) per cent of the net income or profit of said Walker Insurance Agency, *less the guaranteed salary as above set out.* It is understood and agreed between first party and second party that the

net income or profit of said Walker Insurance Agency shall mean the commissions earned through the sale of insurance, less actual operating expenses of the agency.'' (We have italicized the pivotal clause.)

The question is, what is the guaranteed salary to be subtracted from? Walker contends, and the chancellor held, that the salary is to be applied as a credit against 30 per cent of the net profits (these profits being determined without a deduction of the guaranteed salary as an operating expense), so that the bonus represents the difference between the guaranteed salary and 30 per cent of the profits. Under this construction of the agreement Kerr ultimately receives either the fixed salary or 30 per cent of the profits, whichever is greater.

Kerr contends that the italicized clause in the contract means only that the salary is to be deducted from the net income, as an operating expense, before the bonus of 30 per cent is computed. Under this construction the bonus is in effect added to the salary, with the result that Kerr would receive altogether more than 68 per cent of the agency's net income for the year in question. Alternatively, Kerr asks that the contract be reformed if its language should be found not to have the meaning that he attributes to it.

Kerr relies heavily upon the testimony of Jack P. West, the attorney whom the parties jointly employed to prepare the written contract. West, having originally obtained his information from Kerr alone, prepared a preliminary draft of the agreement. He then called the parties together and read the draft to them, explaining it paragraph by paragraph. He states that when he read the paragraph about Kerr's compensation the parties said that they understood it and that it was what they wanted. Over Walker's objection West testified that the salary was to be deducted from the net income, with the bonus being computed upon the remaining amount.

We do not regard West's interpretation of the contract as competent evidence either to explain an ambigui-

ty or to afford a basis for reformation. It is true that prior negotiations between the parties are admissible to show that ambiguous language in the contract was intended to have any particular meaning that the words will reasonably bear, or, if that particular meaning cannot be assigned to the language, to show a mutual mistake that requires a reformation. Rest., Contracts, §§ 242 and 238 (c); *Ben F. Levis, Inc.* v. *Collins,* 215 Ark. 172, 219 S. W. 2d 762. But such testimony must relate to an understanding that was common to both parties; it is not permissible to show the uncommunicated subjective interpretation that one party or the other placed upon the language of the agreement. Rest., Contracts, § 230; *Stoops* v. *Bank of Brinkley,* 146 Ark. 127, 225 S. W. 593.

Although West testified that he explained the provisions of the contract, he does not say that he outlined the formula to be followed in the computation of the bonus. Both Kerr and Walker state that in their negotiations they did not discuss the mechanics of calculating the bonus. We do not see how the parties, without such a discussion, could have had a common understanding of the exact point now presented for decision. Since it does not appear that the attorney's interpretation of the paragraph in controversy was made known to Walker, it follows that the attorney's testimony represents nothing more than his construction of the agreement, which is inadmissible.

Disregarding West's testimony, we are limited in our study to the bare language of the agreement. Persuasive arguments are made by both sides, but we are inclined to believe that the chancellor's view is the more reasonable one. To begin with, it is pretty clear that the contract would have had the meaning that Kerr attributes to it if the italicized clause had been wholly omitted. Walker would then have undertaken to pay ''a bonus based on Thirty (30%) per cent of the net income or profit'' of the agency. In that case it could hardly be supposed that the fixed salary would not be deducted as an operating expense, for it would be next to absurd

to give an employee a bonus upon his own salary. Thus the italicized clause adds nothing to the contract unless we give it the meaning that Walker contends for.

Secondly, it is somewhat unlikely that the proprietor of a going concern, to which he still expected to devote at least part of his time, would enter into an arrangement by which his manager was entitled to more than two thirds of the profits. Thirdly, had the italicized clause been intended to refer to ''the net income or profit'' rather than to ''a bonus,'' the comma immediately preceding the clause should not have been inserted. As a matter of punctuation the use of the comma indicates that the clause refers back to the earlier noun. See Evans, A Dictionary of Contemporary American Usage, p. 94. No really useful purpose would be served by our discussing at length the many other arguments that are made in the briefs.

On cross appeal Walker contends that Kerr was not entitled to the termination pay of $600 which the contract provides for him if he is discharged without cause. It is said that an employee who sues his employer displays such an uncooperative attitude that the employer is entitled to end their relationship. Upon the facts before us this argument is not sound. The bonus was payable at the end of the first year. Kerr says that he made repeated efforts to discuss the bonus with his employer, but Walker was evasive and kept putting him off. After delays of two months and a half Kerr finally brought the matter to an issue by filing suit. To hold that his conduct worked a forfeiture of the termination pay would enable Walker to escape that liability by persistently refusing to recognize Kerr's just request for a discussion of the bonus.

Walker also insists that the chancellor, in determining the net profits for the year, should have disallowed, as bad debts, eleven accounts receivable totaling $644.77. It appears, however, that Walker did not originally treat these accounts as uncollectible, for after the year in question he continued to extend credit to these eleven customers of the agency. All but three of them later

made payments on their accounts, and for the most part these payments exceeded the old debit entries that are now asserted to be uncollectible. The accounts seem to be still carried on Walker's books, and he has not attempted to collect any of them by legal action. The chancellor, upon evidence not designated for inclusion in the record, made a deduction of $778.22 for bad debts. We are not convinced that the weight of the evidence required him also to disallow the eleven additional accounts now in controversy.

Affirmed on direct and cross appeal.