# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-3068

_____

| | | |
|---|---|---|
| Penford Corporation; | * | |
| Penford Products Company, | * | |
| | * | |
| Appellants, | * | Appeal from the United States |
| | * | District Court for the |
| v. | * | Northern District of Iowa. |
| | * | |
| National Union Fire Insurance | * | |
| Company of Pittsburgh, PA; | * | |
| Ace American Insurance Company, | * | |
| | * | |
| Appellees. | * | |

_____

Submitted: April 14, 2011
Filed: November 29, 2011

_____

Before WOLLMAN, GILMAN,[1] and MELLOY, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

A severe flood struck Cedar Rapids, Iowa, in 2008, damaging many of its businesses, including a manufacturing facility owned and operated by Penford Corporation (Penford). Penford submitted claims to its insurers, National Union Fire Insurance Company (National Union) and ACE American Insurance Company (ACE)

_____

[1]The Honorable Ronald Lee Gilman, United States Circuit Judge for the Sixth Circuit Court of Appeals, sitting by designation.

(collectively, insurers), and a coverage dispute ensued. The insurers asserted that certain sublimits in the policy capped reimbursement for damages caused by a flood and that those sublimits applied to both property damage and business interruption losses.[2] Penford claimed that the sublimits applied only to property damage.

Penford brought suit, seeking declaratory judgment and asserting claims for breach of contract and bad faith. After Penford presented its case-in-chief, the district court[3] granted the insurers' motion for judgment as a matter of law (JMOL) on the bad faith claim. At the close of the evidence, both parties moved for JMOL on the remaining claims. The district court granted the insurers' motion, denied Penford's motion, and entered judgment dismissing the action. Penford appeals from the orders and judgment. We affirm.

I.

Penford produces gasoline-additive ethanol, as well as starch for the paper industry at its Cedar Rapids plant (the plant), which sits on a 29-acre parcel adjacent to the Cedar River. This parcel occupies three different flood zones, as established by the Federal Emergency Management Agency: Zone A (roughly the 100-year flood plain); Zone B (roughly the 500-year flood plain); and Zone C (a higher-elevation area). Numerous buildings are situated within the different flood zones. The plant's operation is integrated, such that personnel and materials pass through and among the flood zones during the production process.

---

[2]As did the parties and the district court, we use the terms "business interruption loss" and "time element loss" interchangeably.

[3]The Honorable Linda R. Reade, Chief Judge, United States District Court for the Northern District of Iowa.

In 2008, Penford purchased flood insurance from the National Flood Insurance Program (NFIP) on eighteen of its buildings. It purchased additional insurance from the insurers, issued on a form entitled "Property All Risk Insurance Subscription Policy," with each insurer sharing equal responsibility for any claim under the policy. The policy encompassed Penford's interests in the plant and other assets and provided coverage for losses of up to $300 million. Specific sublimits capped the insurers' liability according to the type of peril insured against. Under the subheading "Flood," the policy provided: "This 'policy' covers direct physical loss or damage caused by or resulting from Flood." J.A. 927. In a later section, it provided: "This 'policy' insures TIME ELEMENT loss . . . directly resulting from direct physical loss or damage of the type insured against this 'policy.'" J.A. 938.

The policy defined sublimits and explained their operation in a subsection entitled "Limits," which provided:

> This "policy" also contains Sublimits as specified under this clause and the various extensions, endorsements, and Sections of this "policy." These Sublimits are part of and not in addition to the [$300 million] Limit of Liability. These Sublimits do not increase the Limit of Liability or any other Sublimit . . . . Sublimits stated below apply per "occurrence" for all "locations" and coverages involved. The maximum Sublimit amount collectible under this "policy" shall be the Sublimit applicable for all loss or damage from a peril insured against by this "policy . . . ," regardless of the number of "locations" or coverages involved in the "occurrence."

J.A. 916-17. An accompanying chart identified the various sublimits that applied to specific perils. The peril sublimit for flood was $50 million "per occurrence and annual aggregate." J.A. 917. Specific flood sublimits applied to the plant in Cedar Rapids: $10 million in Zone A "per occurrence and annual aggregate" and $10 million in Zone B "per occurrence and annual aggregate." J.A. 917.

On June 13, 2008, the Cedar River breached the diking system that surrounded the plant. The river crested two days later, reaching a level twelve feet higher than the previous record set in the 1920s. The flood caused extensive damage to the plant, and plant operations were shut down. In the months that followed, the parties disagreed over what losses were subject to the flood sublimits and over the timeliness and amount of payments due under the policy. The insurers eventually paid $20.5 million, but declined to pay additional claims for business interruption losses.[4] During the ensuing litigation, the parties agreed that intent was crucial to interpreting which losses were subject to the flood sublimits, but disagreed over what they had respectively intended. They offered competing accounts of the circumstances leading up to the issuance of the policy, including the negotiations over which policy form would be used; discussions of the amount and extent of coverage the policy would contain; and the objectives of those involved in the negotiations.

## A. Selection and Issuance of the All Risk Property Policy

Penford contracted with Marsh USA, Inc. (Marsh), an insurance brokerage services firm, to obtain insurance and to handle claims. Under their agreement, Marsh was "engaged to act as [Penford's] risk management advisor and consultant and insurance broker." J.A. 3379. Marsh was also authorized "to represent and assist [Penford] in all discussions and transactions with insurers relating to the lines of insurance" to be procured. J.A. 3380. The agreement provided that Marsh would "negotiate on [Penford's] behalf with insurers and keep [Penford] informed of significant developments in the negotiations." J.A. 3382.

---

[4]The insurers allocated $10 million for damage in Flood Zone A and $10 million for damage in Flood Zone B. The additional $500,000 arose from property damage that Penford suffered in Flood Zone C, to which damage the sublimits did not apply.

Marilyn Rehmer, a Marsh employee, began to consult with Penford on its property insurance coverage in 2006 and was charged with renewing coverage through March 2008. Marsh had helped Penford procure its previous policy through the insurers, and Rehmer resumed discussions with National Union's underwriters, Michael Gunty and Timothy Scott, on the possibility of renewal. At the underwriters' suggestion, Marsh replaced the policy form used the previous year with a policy form that had been used on a different account, which Marsh had brokered as well.

The next year, Rehmer again led the process of obtaining coverage through March 2009. She submitted Penford's specifications to various commercial insurers, including the insurers, and invited reply bids. The submission, dated January 28, 2008, proposed a $300 million limit and "$15,000,000 per occurrence and annual aggregate as respects the peril of Flood in Cedar Rapids, IA." J.A. 2875. Rehmer commenced negotiations with Gunty and Scott of National Union and with Justin Weltscheff, underwriter for ACE. Neither insurer was willing to underwrite $15 million of flood coverage for the Cedar Rapids plant. Both had internal underwriting policies that restricted coverage to $5 million for areas prone to flooding. After further communications, each insurer offered to underwrite $5 million in coverage per flood zone, for a total of $10 million in coverage for Zone A and another $10 million for Zone B. On February 28, 2008, the insurers issued a binder reflecting this figure, and Rehmer renewed coverage on Penford's behalf through March 2009.

In early June 2008, it became apparent that the Cedar River would flood. Mark Wynne, Penford's Vice President and Comptroller for North America, contacted Rehmer with questions about deductibles and qualifications for making a claim. Rehmer replied by email on June 11, offering, among other things, the following coverage summary: "Penford currently purchases National Flood Insurance Program policies for several buildings on the Cedar Rapids, IA campus. Penford also purchases all risk property insurance which includes coverage for flood in Cedar

Rapids, IA for both Flood Zone A for $10,000,000 and in Flood Zone B for $10,000,000." J.A. 2912. Rehmer attached a chart to the email that explained the coverage provided by the NFIP policy and by the insurers' policy.

On June 17, 2008, days after the river crested, Steven Cordier, Penford's Chief Financial Officer and Senior Vice President, wrote a draft press release that was consistent with Rehmer's coverage summary. It stated:

> In addition to [the National Flood Insurance Program], the Company maintains several policies with highly rated insurance companies. The coverage provided includes property damage and business interruption protection. The applicable all risk policy has flood sub-limits aggregating to $20 million for a Cedar Rapids location.

J.A. 3074. When cross-examined about the draft press release at trial, Cordier agreed that "aggregating" meant "taken together as a whole" or "combined." J.A. 289-91.

The same day that Cordier drafted the press release, he met with the loss adjuster named in the policy. The adjuster, together with personnel sent by Marsh, began surveying and documenting the damage throughout the plant and later shared their findings with Penford's management. The general consensus was that losses would exceed the policy's sublimits.

B. The Claims Submission and Payment Process

The provisions in the policy regarding partial payment for loss read as follows:

**PARTIAL PAYMENT OF LOSS SETTLEMENT**

In the event of a loss occurring which has been ascertained to be insured loss or damage under this "policy" and determined by the "company's"

representatives to be in excess of the applicable "policy" deductible, the "company" will advance mutually agreed upon partial payment(s) on the insured loss or damage, subject to provisions of the "policy." To obtain said partial payments, the insured will submit a signed and sworn Proof of Loss as described in this "policy", with adequate supporting documentation.

J.A. 954. In that same section, the policy provided the following procedure for issuance of partial payments:

**SETTLEMENT OF CLAIMS**

The amount of loss . . . for which the "company" may be liable will be paid within 30 days after:

A.     proof of loss as described in this "policy" is received and accepted by the company[.]

J.A. 954. Penford submitted its first claim on July 21, 2008, and received $1.25 million from each insurer by August 1. Penford filed its second claim in early October and received $8 million by October 23, 2008. Penford submitted additional claims in late November and late December, and the insurers made payments within 30 days of the receipt of the claims, for a total payout of $20.5 million.

In addition to the foregoing requests for payment, Penford sought additional payments in late August 2008 and, after receiving no response, sent two letters reiterating its request in late September. The insurers replied by letter on October 14, 2008, declining to provide their coverage position. In a letter dated November 13, 2008, the insurers set forth their position that the sublimits applied not only to property damage, but also to any business interruption loss Penford suffered because of the flood.

All told, Penford alleged property damage of $35.3 million, time element losses of $26.7 million, and professional fees paid for the preparation and submission of the insurance claims of roughly $440,000, for a total loss of approximately $62.5 million.

## C.  Proceedings Before the District Court

After the lawsuit was filed, the parties completed discovery and moved for summary judgment.  After considering the parties' respective motions, the district court found that "the Policy is ambiguous on the question of what losses are subject to the Policy's 'Flood' sublimits,"  D. Ct. Order of Jan. 19, 2010, at 25, and determined that the parties' underlying intent would therefore be interpreted in light of extrinsic evidence offered at trial.

As recounted earlier, the insurers moved for JMOL on the bad faith claim at the close of Penford's case-in-chief.  The district court granted the motion, concluding that no jury would have a sufficient evidentiary basis to find for Penford.  Following the presentation of the insurers' evidence, which included the submission of Rehmer's deposition, the insurers moved for JMOL on Penford's declaratory judgment and breach of contract claims.  Penford submitted a brief in resistance to that motion and moved for JMOL on its remaining claims.

After reviewing the parties' briefs and hearing oral argument, the district court denied Penford's motion and granted the insurers', finding that "no reasonable jury would have a legally sufficient evidentiary basis for finding for plaintiffs on Count 1 and 2 of the complaint, that is, plaintiff's claims for declaratory judgment and breach of contract."  J.A. 530.

II.

We review *de novo* the grant or denial of a motion for judgment as a matter of law, using the same standards as the trial court. Masters v. UHS of Del., Inc., 631 F.3d 464, 469 (8th Cir. 2011). A grant of a JMOL motion is appropriate if "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue . . . ." Fed. R. Civ. P. 50(a). We draw "all reasonable inferences in favor of the nonmoving party without making credibility assessments or weighing the evidence." Phillips v. Collings, 256 F.3d 843, 847 (8th Cir. 2001). To sustain an entry of judgment as a matter of law, "[t]he evidence must point unswervingly to only one reasonable conclusion. This demanding standard reflects our concern that, if misused, judgment as a matter of law can invade the jury's rightful province." Gardner v. Buerger, 82 F.3d 248, 251 (8th Cir. 1996) (citations omitted).

Penford makes two primary arguments on appeal. First, it contends that the district court erred in granting the insurers' motion for JMOL on its bad faith claim because the evidence it presented, and reasonable inferences therefrom, were sufficient to present the claim to the jury. Second, Penford argues that the district court should have granted its JMOL motion, not that of the insurers. According to Penford, the trial evidence did not resolve the ambiguity in the policy language, and thus the language should have been construed against the drafter, under the doctrine of *contra proferentem*. In the alternative, it contends that the district court should have adhered to its summary judgment ruling: because the policy was ambiguous, the parties' intention was a question of fact to be resolved by the jury. In granting the insurers' JMOL motion, Penford contends, the district court usurped the jury's role by assessing credibility and weighing the evidence.

A.  Bad Faith Claim

Penford contends that the district court erred by ruling that no reasonable jury could conclude that the insurers had acted in bad faith by failing to investigate Penford's claim properly and by failing to make timely payments.

Iowa first recognized a claim of first-party bad faith in <u>Dolan v. Aid Insurance Co.</u>, 431 N.W.2d 790 (Iowa 1988).  To establish a first-party bad faith claim, a plaintiff must prove that (1) the insurer had no reasonable basis for denying the plaintiff's claim or for refusing to consent to settlement; and (2) the insurer knew or had reason to know that its denial or refusal lacked a reasonable basis.  <u>Sampson v. Am. Standard Ins. Co.</u>, 582 N.W.2d 146, 149 (Iowa 1998).  The first element is objective, and the second is subjective.  <u>Belleville v. Farm Bureau Mut. Ins. Co.</u>, 702 N.W.2d 468, 473 (Iowa 2005).  "When a claim is 'fairly debatable,' the insurer is entitled to debate it, whether the debate concerns a matter of fact or law."  <u>Dolan</u>, 431 N.W.2d at 794.  Furthermore, "[w]hether a claim is fairly debatable can generally be decided as a matter of law by the court."  <u>Belleville</u>, 702 N.W.2d at 473.

In its order denying summary judgment, the district court concluded that the policy was ambiguous and that the language was susceptible to two reasonable interpretations.  Penford has argued that the summary judgment order was correct and that the district court should have granted its JMOL motion, construing the ambiguous language against the insurers, or submitted the case to the jury.  If the language was susceptible of two reasonable interpretations, it follows that the question of whether a claim for business interruption losses was captured and capped by the sublimits was "fairly debatable."  Because the insurers had a reasonable basis for denying coverage for such losses, they cannot be held to have acted in bad faith.  See <u>Gardner v. Hartford Ins. Accident & Indem. Co.</u>, 659 N.W.2d 198, 206 (Iowa 2003) (concluding

-10-

that "[w]here an objectively reasonable basis for denial of a claim actually exists, the insurer cannot be held liable for bad faith as a matter of law").

As an alternate ground for reversal, Penford counters that the insurers unreasonably delayed payment in the face of obvious, extensive losses, thereby breaching their duty. But, as recounted above, the policy required only that the insurer make a payment within 30 days of receiving a sworn statement of proof of loss. The insurers complied with this provision on each of the four occasions that Penford submitted a sworn proof-of-loss statement. Accordingly, Penford's alternate argument is without merit.

We conclude that the insurers had an objectively reasonable basis for interpreting the sublimits as they did and that their payment schedule complied with the policy's requirements. Accordingly, the district court did not err in granting the insurers' JMOL motion on Penford's bad faith claim.

## B. Denial of Penford's JMOL Motion

Penford asserts that the district court should have granted its motion for judgment as a matter of law under the doctrine of *contra proferentem.* According to Penford, the district court correctly determined that the policy language at issue was ambiguous but erred in failing to resolve that ambiguity by applying the doctrine against the insurers, as the drafters of the policy. In considering the denial of Penford's JMOL motion, we construe all evidence in the light most favorable to the insurers.

We conclude that the doctrine of *contra proferentem* is inapplicable here. First, the evidence most favorable to the insurers is equivocal on the identity of the drafter of the policy form, given the back-and-forth nature of the drafting process and the

relatively equal bargaining power of the parties.  See Terra Intern., Inc. v. Miss. Chem. Corp., 119 F.3d 688, 692 (8th Cir. 1997) (declining to apply the doctrine on grounds that parties were of relatively equal bargaining strength).  Moreover, the doctrine should not be applied when the question may be resolved in light of facts developed via extrinsic evidence.  See DeGeare v. Alpha Portland Indus., Inc., 837 F.2d 812, 816 (8th Cir. 1988) (concluding that "[a]mbiguities should be construed against the drafter only if after application of ordinary rules of construction and consideration of extrinsic evidence, the ambiguities remain") *vacated on other grounds sub nom.* DeGeare v. Slattery Grp., 489 U.S. 1089 (1989); see also Residential Mktg. Grp., Inc. v. Granite Inv. Grp., 933 F.2d 546, 549 (7th Cir. 1991) (concluding that the doctrine "does not bar the use of oral testimony to disambiguate a written contract," but "is a tie-breaker, used to resolve cases in which the written contract remains ambiguous even after oral evidence has been admitted").  We thus conclude that the district court properly denied Penford's JMOL.

### C.  Grant of the Insurers' JMOL Motion

We next consider Penford's alternative argument that the extrinsic evidence on the issue of intent did not "point unswervingly to only one reasonable conclusion," Gardner, 82 F.3d at 251, and that the district court therefore erred by granting the insurers' JMOL motion.

When contract language is ambiguous, "we must engage in a process of interpretation to search for the meanings attached by each party at the time the contract was made."  Clinton Phys. Therapy Serv., P.C. v. John Deere Health Care, Inc., 714 N.W.2d 603, 615 (Iowa 2006) (internal quotation marks omitted).  "[E]xtrinsic evidence is admissible when it sheds light on the situation of the parties, antecedent negotiations, the attendant circumstances, and the objects they were striving to attain."  Id. (internal quotation marks omitted).  As noted by the district

-12-

court in its summary judgment ruling, if the extrinsic evidence is undisputed, the court will construe the contract as a matter of law. D. Ct. Order of Jan. 19, 2010, at 15 (citing State Farm Mut. Auto. Ins. Co. v. Townsend, 361 N.W.2d 332, 335 (Iowa 1984)). "When the interpretation of a contract depends on the credibility of extrinsic evidence or on a choice among reasonable inferences that can be drawn from the extrinsic evidence, the question of interpretation is determined by the finder of fact." Pillsbury Co. v. Wells Dairy, Inc., 752 N.W.2d 430, 436 (Iowa 2008); see also Restatement (Second) of Contracts § 212(2) (1981).

We have held that judgment as a matter of law may be appropriate in a case in which summary judgment was initially denied. See Armco Steel Corp. v. Realty Inv. Co., 273 F.2d 483, 485 (8th Cir. 1960) ("When, however, both parties have had an opportunity to adduce all relevant, available evidence so that the trial court is no longer uncertain as to the circumstances of the case, then slight doubt as to the facts is insufficient to avert a directed verdict or a judgment notwithstanding the verdict."). The district court did not elaborate on its reasoning in granting the motion. Implicit in its ruling, however, is the conclusion that the extrinsic evidence presented at trial removed any ambiguity regarding the meaning of the sublimits provision. Accordingly, we must determine whether, when viewed in the light most favorable to Penford, a reasonable jury could have concluded that the sublimits did not capture and cap business interruption losses.

The insurers contend that the extrinsic evidence showed that the parties to the negotiation shared a mutual understanding that the sublimits applied to all losses, including business interruption losses. They cite testimony from the underwriters, each of whom understood that peril sublimits apply to all forms of coverage. Weltscheff testified that this understanding was "basic 101 insurance," a bedrock principle that prevailed across the industry. Tr. 1215:24. The insurers contend that not only did the underwriters share this understanding, but that Rehmer, Penford's

agent, did so as well. They assert that Rehmer was aware that the underwriters were prevented from offering more than $5 million for locations categorized as 100-year flood zones, as was Zone A, in the absence of prior approval. They refer to Rehmer's statement that it was her understanding that the two sublimits would apply to both property damage and time element loss, citing the following testimony from her December 2009 deposition:

> Q: When you wrote this [June 11, 2008, email to a Penford representative], was it your understanding that the two $10 million Cedar Rapids flood sublimits would apply to both property damage and time element loss?
>
> A: It was my understanding, yes.

J.A. 603. The insurers maintain that, as Penford's agent, Rehmer was aware that each insurer intended to limit its exposure to $10 million, that she understood that the sublimits would apply to business interruption losses, and that her knowledge should be imputed to Penford under agency principles.

The insurers contend that because Penford presented no affirmative evidence regarding the policy's underlying intent, the extrinsic evidence the insurers submitted was uncontested and left no question that the parties had attached the same meaning to the contract at the time it was made. In such circumstances, the insurers argue, Penford cannot avoid that meaning and its attendant consequences by offering another construction, even if such were reasonable on its face.[5] Accordingly, they argue that because the interpretation of the contract did not depend on "the credibility of

---

[5]See 2 E. Allan Farnsworth, Farnsworth on Contracts, § 7.9, at 275-76 (3d ed. 2004) ("Surely if one party shows that the other party attached the same meaning that the other party did, the other party should not be able to avoid that meaning by showing that a reasonable person could have attached a different one.").

-14-

extrinsic evidence or on a choice among reasonable inferences that can be drawn from the extrinsic evidence," Pillsbury, 752 N.W.2d at 436, the district court properly granted their JMOL motion.

We disagree with the insurers' suggestion that, when faced with their undisputed evidence regarding intent, the district court had no choice but to grant their motion. "[W]hile a district court is permitted to enter judgment as a matter of law when it concludes that the evidence is legally insufficient, it is not required to do so. To the contrary, the district courts are, if anything, encouraged to submit the case to the jury, rather than granting such motions." Unitherm Food Sys. v. Swift-Eckrich, Inc., 546 U.S. 394, 405 (2006). Penford argues that, by granting the insurers' motion, the district court not only ignored this prudential precept, but also failed to apply Federal Rule of Civil Procedure 50(a)'s exacting standard.

Penford argues that even if the insurers' extrinsic evidence was undisputed, it derived primarily from the testimony of interested witnesses and therefore should have been disregarded. In the alternative, Penford contends that it provided sufficient evidence to impeach and contradict the insurers' extrinsic evidence and thus raised issues of fact and credibility that were rightfully within the province of the jury.

When ruling on a JMOL motion, a district court must "consider 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" Wilson v. Brinker Int'l, Inc., 382 F.3d 765, 770 (8th Cir. 2004) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151 (2000)). "Put another way, we must accept all the evidence favoring [the nonmoving party], but only the evidence favoring [the moving party] that is uncontradicted and unimpeached and that comes from disinterested witnesses." Salitros v. Chrysler Corp., 306 F.3d 562, 569 (8th Cir. 2002). Penford takes this statement to mean that the testimony of interested parties must be

discounted entirely when considering a JMOL motion. It contends that the underwriters were interested parties because they were employees of the insurers and could arguably be blamed if the policy they drafted exposed their employers to more liability than had been anticipated or approved. Thus, according to Penford, the district court should have disregarded their testimony in conducting its Rule 50(a) analysis.

We do not believe such an insuperable bar exists. Our sister circuits have recognized that, in employment discrimination cases, a district court may consider testimony from the employer's agents at the summary judgment stage even though the agents are arguably interested parties. Traylor v. Brown, 295 F.3d 783, 791 (7th Cir. 2002) (rejecting interpretation that would "require a court to ignore the uncontroverted testimony of company employees or to conclude, where a proffered reason [for terminating the plaintiff-employee] is established through such testimony, that it is necessarily pretextual"); Sanstad v. CB Richard Ellis, Inc., 309 F.3d 893, 898 (5th Cir. 2002) (rejecting same interpretation). Whether it is proper to credit the testimony of an interested witness will depend on the context and circumstances at issue. See 9B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2527 (3d ed. 2008) ("Often it will be for the jury to determine the credibility of uncontradicted and unimpeached testimony of an interested witness but in other circumstances even this testimony must be believed."). In this case, the insurers purported to offer more than testimony from interested parties: they assert that the extrinsic evidence shows that all parties involved in the negotiations, including Penford's agent, operated under the same implicit agreement regarding the scope of the sublimits.

Penford argues that a reasonable jury would not be required to believe that the parties intended for the flood sub-limits to apply to property damage and business interruption losses. Penford asserts that it adduced evidence in support of the inference that the sublimits, as written, were not intended to cap business interruption

-16-

losses, pointing to a document from National Union entitled "Property Underwriting Practices and Procedures Manual," which reads:

> **1.3 Sublimits**
> Whenever a sublimit is used and the policy covers Property Damage (PD) and Time Element (TE) it should be made clear that the sublimit is a combined PD/TE sublimit.

J.A. 2937. Gunty admitted that the underwriters did not apply this provision in this case. The absence of such a clear statement, Penford argues, was evidence that the parties did not intend for the flood sublimits to cap any coverage other than for property damage.

Penford's argument is misplaced. It is not enough to have adduced evidence that its interpretation of the sublimits was reasonable or to imply that had the underwriters really intended for the sublimits to apply to all coverages, they would have made that point explicitly. The underwriters testified that the policy did make that point explicitly, as recounted in Gunty's testimony:

> Q: Is there any other language that you seized upon in this [sublimits] provision as consistent with your intent in underwriting the account?
>
> A: Go down to the next paragraph, I guess, the line that says "sublimits stated below." "Sublimits stated below apply per occurrence for all locations and coverages involved." That, to me, was really a key part of the heart and soul of what was we were trying to get across, and this wording did a very fine job with that. It says that if you have a sublimit, that sublimit is going to apply on a per occurrence basis and it includes all coverages. That's pretty comprehensive. That was exactly our intent. And those words say that precisely.

Tr. 1081:1-15. As set forth above, Rehmer's deposition confirmed that she understood the flood sublimits in the same way. This evidence of mutual intent is the most salient evidence available. See Swainston v. Am. Family Mut. Ins. Co., 774 N.W.2d 478, 481 (Iowa 2009) ("In construing insurance contracts, we adhere to the rule that the intent of the parties must control.") (internal quotation marks omitted); Pillsbury, 752 N.W.2d at 436 ("The cardinal rule of contract interpretation is to determine what the intent of the parties was at the time they entered into the contract.").

Thus, to overcome the insurers' extrinsic evidence, Penford was required to establish that a reasonable jury would have had a sound basis to conclude that no such mutual understanding existed at the time the contract was entered into. Penford contends that not only could a reasonable jury decline to impute Rehmer's statements to Penford, but also could conclude that those statements lack credibility.

Penford denies that Rehmer's understanding of the contract terms can be imputed to it with binding effect. It contends that Marsh had offered to provide the service of "interpretation of insurance policies," but that that service was not included in its agreement with Marsh. Penford seems to suggest that Rehmer had the authority to negotiate the terms of the policy, but should not have been permitted to recount what she understood those terms to mean. We do not agree. Rehmer served as Penford's broker and chief negotiator, and her deposition testimony should be read in that light. Rehmer was in the best position to offer to Penford a precise account of what would be covered under the policy. Her understanding of what the sublimits meant reflected her interactions with the insurers' representatives and her awareness of the meaning the parties had respectively attached to the sublimits provision. We find unpersuasive Penford's attempt to distance itself from Rehmer's deposition testimony, particularly in light of its request for her opinion and its reliance on that opinion when preparing for the impending flood.

-18-

Penford argues in the alternative that it should not be bound by Rehmer's testimony because it lacks credibility and cannot be taken at face value. Penford contends that evidence adduced at trial revealed Rehmer's "ongoing financial ties" to the insurance industry. Appellant's Br. 57. It points to Gunty's cross-examination, in which he explained that brokers from Marsh and other insurance brokerage firms earn a commission from the insurers for each policy they place with insureds. At no point in this line of questioning, however, was Rehmer ever mentioned by name, and thus the nonspecific nature of this testimony is insufficient to sustain an inference that would undermine Rehmer's credibility. Furthermore, Penford called as a witness Richard Michaels, Rehmer's supervisor at Marsh. Among other things, Michaels described Rehmer as a key member of the team and expressed confidence in her ability to deliver quality service. He agreed that she would be the person to whom Penford would direct questions related to coverage and stated that he would expect her to make her best effort to answer its questions, hardly the description of one whose testimony should be deemed lacking in probity.

We conclude that there was no factual dispute regarding whether Rehmer shared the same understanding as the underwriters and whether that understanding bound Penford. Consequently, the interpretation of the contract did not depend "on the credibility of extrinsic evidence or on a choice among reasonable inferences that can be drawn from the extrinsic evidence," Pillsbury, 752 N.W.2d at 436, and thus the district court did not err when it granted the insurers' JMOL motions on the declaratory judgment and breach of contract claims.

The judgment is affirmed.

_____