**DORCHESTER MINERALS, LP, Plaintiff**

v.

**CHESAPEAKE EXPLORATION, LLC, Defendant**

**No. 4:12CV00461 JLH**

United States District Court, E.D. Arkansas, Western Division.

Signed 04/05/2016

John Robert Beatty, Joseph A. Unis, Jr., Locke Lord LLP, Dallas, TX, Robert M. Honea, Hardin, Jesson & Terry, Fort Smith, AR, for Plaintiff.

Amy Lee Dashiell Christopher Sileo, Scott, Douglass & McConnico, L.L.P., Austin, TX, DOuglas M. Carson, Jerry L. Canfield, Daily & Woods, P.L.L.C., Fort Smith, AR, for Defendant.

## AMENDED AND CORRECTED FINDINGS OF FACT AND CONCLUSIONS OF LAW

J. Leon Holmes, United States District Judge

This case concerns six substantially identical leases in which Dorchester Minerals, L.P., leased more than 9,000 acres of mineral interests to Chesapeake Exploration, LLC, for production of natural gas. Dorchester contends that Chesapeake has failed to make gas royalty payments in accordance with the terms of the leases. The central issue concerns the interpretation of the gas royalty clause. The parties filed cross motions for summary judgment on that issue. The Court denied the motions of both parties, holding that the gas royalty clause is ambiguous and concluding that the interpretation of the provision must be submitted to the finder of fact at trial. The parties waived a jury trial and submitted the issue to the Court during a bench trial. The dispute concerns lease clause 3(b), the gas royalty clause, which provides:

(b) Royalty on Gas. On gas, including casinghead gas or other gaseous substances, produced and saved from the premises [other than for processing at a plant as described in Paragraph 3(d) hereof], Twenty–Five Percent (25.0%) of the proceeds received from any sale of such gas at the point of sale or delivery of the gas produced and saved. Any deduction for the expenses of production, gathering, dehydration, compression, transportation, (except non-affiliated transportation charges incurred on interstate pipelines regulated by the Federal Energy Regulatory Commission and/or pipelines whose transportation rates are regulated by the State of Arkansas. Said transportation charges will be limited to direct for amounts of Lessor's gas transported and Lessee will not be able to deduct charges for unutilized pipeline capacity,), manufacturing, processing, treating or marketing of such gas shall be added to the price received by Lessee for such gas so that Lessor's royalty shall not be charged directly or indirectly with any such expenses. Provided, however the proceeds from any such well shall always be equal to or greater than the proceeds received from sales in the field or prevailing area whichever is the greater, but not less than received by Lessee or any of its affiliates, exclusive of the above enumerated expenses except for those transportation charges incurred in a regulated pipeline system as set forth above.

Document # 82–1 at 1. Dorchester interprets the gas royalty clause as follows:

(1) Chesapeake must pay royalties to Dorchester based on the proceeds [that is, the price(s) ] received by Chesapeake from any sale of gas

produced and saved from Lease wells at the point of sale or delivery of the gas;

(2) The price(s) at which Chesapeake must pay royalty to Dorchester under the first sentence of the Gas Royalty Clause must be compared to the highest price(s) received by either Chesapeake or any other party from any sales of natural gas in the field or prevailing area; and

(3) "Field" means the twelve-county geographic area in north central Arkansas from which natural gas is produced from the Fayetteville shale formation, commonly known as the Fayetteville Shale Field, and "prevailing area" means any point at which natural gas produced from the Fayetteville Shale Field is commonly or regularly sold, which is not limited to the locality of production.

Document # 138 at 5. Chesapeake, in contrast, denies that the royalty clause provides that it must pay to Dorchester the highest price received by either Chesapeake or any other party from any sales of natural gas in the field or prevailing area, arguing that the gas royalty clause provides for royalties to be based solely on its proceeds. Document # 140 at 2–3. According to Chesapeake, the phrase "field or prevailing area" refers to the area where production occurs, with the term "prevailing area" extending the field. *Id.* at 5. Chesapeake argues that the last sentence of the royalty clause provides for a comparison between Chesapeake's sales in the field or prevailing area and its sales outside the field or prevailing area. *Id.* at 12. After receiving all the evidence and reviewing the briefs of the parties, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Dorchester is a publicly-traded Texas limited partnership based in Dallas, Texas. Formed in 2003, Dorchester owns oil and gas interests in approximately 500 counties across 25 states. The majority of those interests are oil and gas leasehold royalty interests. Tr. 36.

2. Casey McManemin has been Dorchester's chief executive officer since 2003. Tr. 36. Mr. McManemin is a petroleum engineer by education and by experience. Tr. 37. Prior to forming Dorchester, Mr. McManemin was a consulting petroleum engineer with the Houston-based consulting firm of BP Huddleston & Co., from May 1984 until July 1988. Tr. 37, 40. After leaving BP Huddleston & Co., Mr. McManemin was an independent oil and gas investor for several years. Tr. 40–41. After leaving BP Huddleston & Co. but before forming Dorchester, Mr. McManemin had negotiated approximately 500 oil and gas leases; he has negotiated approximately 700 additional leases since forming Dorchester in 2003. Tr. 44–45.

3. Chesapeake Exploration is an Oklahoma limited liability company based in Oklahoma City, Oklahoma. Document # 82 at ¶ 2; Document # 85 at ¶ 2.

4. Mr. McManemin has negotiated several oil and gas leases with Chesapeake on behalf of Dorchester since 2003 covering discrete tracts of land in Texas and Oklahoma. Tr. 46–48. Mr. McManemin negotiated the leases with George Denny of Chesapeake. Tr. 60–78; Defendant's Ex. 63, Deposition of George Denny at p. 8:25–12:25. Mr. Denny testified by deposition that his first lease negotiations with Dorchester were in either 2000 or 2001 and related to minerals in either south Texas or Oklahoma. Denny Depo. at 7–8. Mr. Denny testified that Dorchester "had a difficult lease form" and that Mr. McManemin "is a tough negotiator, but we got

along well." Denny Depo. at 8:3–6. He added that Mr. McManemin is "demanding and knows what he wants and tries to get there." Denny Depo. at 8:7–9.

5. Dorchester owns net mineral interests of more than 9,000 acres in eight Arkansas counties located in what eventually came to be known as the Fayetteville Gas Shale Play area. Tr. 56–59; Plaintiff's Exhibit 1. After receiving indications of interest in leasing small parts of Dorchester's Fayetteville Shale Play mineral interests, and after participating in a few Fayetteville Shale Play area wells pursuant to integration orders issued by the Arkansas Oil and Gas Commission, Dorchester decided to "test the waters" for interest in leasing all or substantially all of Dorchester's mineral interests in the Fayetteville Shale Play area. Tr. 48–54.

6. On or about January 30, 2006, Dorchester sent requests for proposals to approximately eight different exploration and production companies including SEECO, Chesapeake, and others. Tr. 54–55. Dorchester received several responsive offers. Tr. 60. After evaluating those offers, Dorchester commenced negotiations with Mr. Denny of Chesapeake. Tr. 60–65.

7. Initially, Mr. Denny proposed the use of Chesapeake's standard Arkansas oil and gas lease form. Tr. 65–66; Denny Depo. at 12:2–10. That lease form was not acceptable to Dorchester. Tr. 67. After additional negotiations, Chesapeake proposed that Dorchester consider a form of lease that Chesapeake had entered into with a Texas company named Black Stone Minerals. Denny Depo. at 10:13–11:15, 12:11–16. Mr. Denny testified that "I suggested that we start with that form and make some minor provisions for Casey's—for what he normally has in his leases." Denny Depo. at 12:18–20. Mr. McManemin's testimony was substantially the same on these points. Tr. 67–69.

8. Once Dorchester's negotiations centered on offers made by Chesapeake, Chesapeake offered a 25% royalty and increased its per acre bonus offer from $500 per acre to $625 per acre resulting in an increase of more than $1 million in the bonus paid on the final lease acreage. The final lease bonus was $6,121,587.50. Defendant's Exhibits 4–5.

9. Dorchester was looking for three key elements in evaluating the Black Stone Minerals lease form that Chesapeake proposed: (1) a comparative pricing analysis in the royalty provision such that the royalty payments Dorchester would receive would not be limited to a basis derived from the proceeds that Chesapeake receives; (2) protection in the assignment provision such that Dorchester would be able to review Chesapeake's performance under the leases prior to consenting to any assignment of the lease by Chesapeake; and (3) access to the information necessary for Dorchester to evaluate Chesapeake's performance. Tr. 73. Mr. McManemin testified that he agreed to use the Black Stone Minerals lease form because that lease form met those three requirements. Tr. 73–74.

10. For example, according to Mr. McManemin, a Loving County, Texas lease that the parties had previously negotiated included a similar, "comparative pricing analysis." Tr. 111–12. Dorchester did not, however, introduce into evidence a copy of that lease or any prior lease. Mr. McManemin testified that the leases had to be "jurisdiction specific." Tr. 184–85. While that is no doubt true in many respects, it is not an adequate explanation for not introducing the prior leases so that their royalty clauses could be compared with the gas royalty clause at issue. Without evidence of the language in the gas royalty clauses in the prior leases, Mr. McManemin's testimony as to the course of dealing between

Dorchester and Chesapeake is unpersuasive because it does not prove that the parties had a course of dealing in which they construed royalty clauses with language similar to the clause at issue in the manner that Dorchester contends this clause should be construed. Some royalty clauses, such as the leases at issue here, provide for royalties based on sales proceeds, whereas others provide for royalties based on the market value of the leases. Tr. 328. The evidence failed to show whether the prior leases of which Mr. McManemin spoke were proceeds leases, market value leases, or some other type of lease.

11. Neither Mr. McManemin nor Mr. Denny could remember there having been any discussions between them about the royalty clause at issue other than increasing the percentage of the royalty to 25%. Tr. 70–72; Denny Depo. at 10–11. Consequently, there is no evidence that the parties agreed on the meaning of the gas royalty clause when they executed the leases at issue.

12. On July 27, 2006, Dorchester and Chesapeake entered into the six oil and gas leases at issue, permitting Chesapeake to drill for oil and gas on Dorchester's mineral interests in Van Buren, White, Cleburne, Faulkner, Pope, and Conway counties in Arkansas. Plaintiff's Exhibits 7A–7F. Except for the property descriptions, the six leases are substantially identical. Tr. 78–79. Those six Arkansas counties form the core of the shale natural gas development play commonly referred to as the Fayetteville Shale Gas Play.

13. The transaction documents included a letter agreement dated March 30, 2006, an Exhibit A to the letter agreement which identified the subject mineral interests, and an Exhibit B to the letter agreement which provided the form of lease agreement to be used and executed once title

verification had taken place with reference to the mineral interests to be leased. Regarding the form for the letter agreement, Chesapeake provided an initial draft (Defendant's Exhibit 6); and after negotiation, Mr. McManemin of Dorchester provided a "major rewrite" of the letter agreement. Tr. 134; Defendant's Exhibits 7–8. The Exhibit A list of subject properties was initiated by the list of properties attached to Dorchester's request for proposals, and Dorchester added additional properties on March 28, 2006. Defendant's Exhibit 10. The form of lease was initially proposed by Chesapeake with its offer made on March 1, 2006 (Plaintiff's Exhibit 3). That lease form was rejected by Dorchester on March 23, 2006 (Plaintiff's Exhibit 4). As noted above, Chesapeake proposed a lease form based on a lease Chesapeake had previously entered into with Blackstone Minerals Company, LP (Tr. 70; Plaintiff's Exhibits 5–6); and Dorchester negotiated changes in the lease form for the benefit of Dorchester, which changes included increased royalty percentage, removal of a lease renewal provision, the addition of language authorizing Dorchester to utilize well information in Dorchester's ordinary course of business, and added insurance obligations for Chesapeake. Tr. 75, 133–35.

14. The letter agreement of March 30, 2006 (Plaintiff's Exhibit 8) and the lease form agreed by the parties for use in the transaction (Exhibit B to the March 30, 2006 agreement) and subsequently utilized as the lease form for the subject leases (Plaintiff's Exhibits 7A–7F) were the result of arms length negotiations and mutual contributions between two experienced, sophisticated oil and gas entities who were substantially equal in bargaining power. If the parties had intended that royalties would be based on market value, or the maximum price for which the gas could be sold, the leases would have so stated. *See,*

for example, Defendant's Exhibit 65, Martin Report, Exhibit 6 (of the Martin Report) at ¶ 2 and Exhibit 8 (of the Martin Report) at ¶ 3(b) and ¶ 19(c).

15. The term "field," as used in the royalty clause at issue, means the area where the wells are located. Tr. 116–17, 211–12. Fields are designated by the state agencies—in this case, the Arkansas Oil and Gas Commission. Tr. 274; Williams & Meyers, MANUAL OF OIL AND GAS TERMS at 381 (16th ed. 2015).

16. The term "prevailing area" is not a common term in the oil and gas industry. Tr. 326. *Prevailing* is "[a]n adjective sometimes employed in an oil and gas lease royalty clause to denote a quality of such a word or term as 'price,' 'value,' 'market price,' 'market value,' or 'posted price.'" Williams & Meyers at 813. In that context, the term *prevailing* usually should be construed as referring to an arithmetic mean. *Id.*

17. While the term "field or prevailing area" is not a common term in the oil and gas industry, it is similar to the term "field or area" or "field or general area," which are common terms. Defendant's Exhibit 65, Martin Report at 8, Exhibit 6 (of the Martin Report) at ¶ 2, and Exhibit 8 (of the Martin Report) at ¶ 19(c). The phrase "field or prevailing area" as used in the last sentence of the gas royalty clause is a reference to the locality of production of the subject natural gas and denotes areas at or near the area of gas production. Tr. 116–17, 212–13, 273–80.

18. The use of both "field" and "prevailing area" is not redundant but is a recognition that a "field" created by a regulatory body, such as the Arkansas Oil and Gas Commission, may not be sufficiently large to include availability to market and, thus, the term "prevailing area" is added to the phrase to ensure market availability for the purpose of the comparison provided by

the last sentence of the gas royalty clause. Tr. 273–74. At the time of execution of the subject leases, AOGC General Rule B–38 specified that an application for the creation of field rules must be submitted to the Commission within the earlier of six months after completion of a well in a new reservoir or pool or the completion of three wells within the pool. Defendant's Exhibit 49; Plaintiff's Exhibit 25, Berghammer Report at 3. Before the execution of the subject leases, the Commission had created at least five small fields in five of the six counties involving the subject leases, each field consisting of a single or a few governmental sections. Defendant's Exhibits 34–38 and 50; Plaintiff's Exhibit 25, Berghammer Report at 3; Tr. 269–71. At the time the subject leases were entered into, the five fields created by the Commission were too small to have good pipeline access and, possibly, had no access at all. Tr. 273–74.

19. After execution of the subject leases, and in an effort to ease the regulatory burden of creating and maintaining multiple fields for the Fayetteville Shale Play, the Commission adopted General Rule B–43 on October 16, 2006, abolishing the then existing fields and creating uniform spacing provisions for the entire shale play. Defendant's Exhibit 53; Plaintiff's Exhibit 25, Berghammer Report at 3–4. The Rule provided for drilling units consisting of a single governmental section, typically containing approximately 640 acres. Rule B–43, Defendant's Exhibit 33, at (f).

20. Interpreting "field or prevailing area" as a reference to the locality of production is consistent with established law regarding the phrase "field or area" as used in 30 C.F.R. § 206.151 as a reference to the geographic region of gas production. Defendant's Exhibit 32; Tr. 209, 212, 275–77. "Field and area" does not include market areas away from the areas of produc-

tion. Tr. 276–77, 281. State lease forms likewise use "field or area," as references to the locality of production. Defendant's Exhibit 48; Tr. 277–79. The word "prevailing" does not change the word "area" from a reference to the locality of production into a reference to down-pipe market areas; rather "prevailing" modifies "area" to note possible expansion of the production area and to expand the possibly limited "field" sufficiently to provide pipeline access and resulting sales necessary for the last sentence comparison. Plaintiff's Exhibit 25, Berghammer Report at 4; Tr. 212–13, 274, 280–81.

21. The interpretation of "field or prevailing area" to refer to the area of production is consistent with the order of sentences within the gas royalty clause. The last sentence does not follow the first but rather follows the permitted deductions language, which allows only the cost of regulated pipeline transportation to downstream markets as a deduction from sales proceeds. The order of sentences suggests that last sentence requires a comparison of the "proceeds from any such well" (which proceeds include downstream sales less permitted transportation expenses) to "proceeds from sales in the field or prevailing area" (sales in the locality of production with no permitted transportation deduction). Plaintiff's Exhibit 25, Berghammer Report at 5. In other words, the last sentence in the gas royalty clause protects Dorchester from the possibility that Chesapeake might sell gas downstream on an interstate pipeline for less, after deducting the cost of transportation, than the price for which it would have been sold in the area where production occurs. Tr. 209, 212.

22. The Wind River Basin in Wyoming provides an appropriate illustration of the phrase "field or prevailing area." Tr. 213. The Wind River Basin situation is comparable to the Fayetteville Shale situation. Each has or had small fields designated by a regulatory body; each has a larger prevailing area of production with access to pipelines, thus creating markets for comparison purposes; and each has a large market area via interstate pipelines removed from the field and prevailing area. Tr. 267–71, 279–82. The Basin is the "prevailing area" in the Wyoming situation, just as the Arkansas counties having Fayetteville Shale production constitute the current "prevailing area" for the subject leases. Tr. 213, 280–82; Defendant's Exhibit 56.

23. For the reasons stated, the Court finds that the term "field or prevailing area" as used in the subject leases is a reference to the locality of production, including the points of connection of the production gathering systems with interstate pipelines, and that it is not a reference to market areas on interstate pipeline systems removed from the area of production.

24. The last sentence of the gas royalty clause calls for a comparison of the "proceeds from any such well" to the "proceeds received from sales in the field or prevailing area." The "proceeds from any such well" is a reference to the proceeds identified in the first sentence of the gas royalty clause as modified by provisions adding back into proceeds any deducted post-production costs except described unaffiliated transportation costs. The "proceeds received from any such well" are required to be compared to the "proceeds received from sales in the field or prevailing area whichever is the greater."

25. The first sentence of the gas royalty clause provides for a gas royalty of 25% "of the proceeds received from any sale of such gas at the point of sale or delivery of the gas produced and saved." By limiting the proceeds to the sale of "such gas" that

portion of the gas royalty clause limits proceeds to those that result from sales by Chesapeake pursuant to the leases at issue. Similarly, in the first portion of the last sentence, "the proceeds from any such well" must refer to proceeds received by Chesapeake from sales pursuant to the leases at issue. In the following portion of the sentence, which provides for a comparison, "the proceeds" are not limited to "such gas" or "such well;" rather, the only limit is comparison must be with proceeds received "from sales in the field or prevailing area whichever is the greater." In other words, the comparison is between proceeds received by Chesapeake from sales of gas from wells that are the subject of the leases with any sales, not just Chesapeake's, in the field or prevailing area. This construction of the comparison language is confirmed by the final portion of the last sentence, "but not less than received by Lessee or any of its affiliates, exclusive of the above enumerated expenses except for those transportation charges incurred in a regulated pipeline system as set forth above." If the comparison language—"proceeds received from sales in the field or prevailing area whichever is the greater"—were limited to proceeds received from Chesapeake's sales, the additional language prohibiting the "proceeds from being less than received by Lessee" would be redundant. Furthermore, the phrase, "whichever is greater," refers to proceeds from sales in the field as compared to proceeds from sales in the prevailing area, whichever proceeds are greater. "Whichever is greater" does not, as Chesapeake argues, refer to the geographic size of the field or the prevailing area because, by definition, the prevailing area is an extension of the field, so it always will be greater.

26. Chesapeake argues that its proposed interpretation of the gas royalty clause must be adopted because the parties pro-

ceeded into the leases for a period of approximately six years before Dorchester objected to the manner in which the royalties were paid. That argument fails because the reported values provided by the lessee, Chesapeake, to the lessor, Dorchester, do not contain sufficient information to allow the lessor to verify the basis on which the proceeds are calculated, nor whether the sales occur at the wellhead, at the outlet of the gathering system, or downstream on an interstate pipeline. Tr. 155, 202–03, 232, 255–61.

## CONCLUSIONS OF LAW

■■■■ In assessing the evidence and making findings of fact, the Court has attempted to apply the "three well-established principles of contract law" that guide Arkansas courts. *Smith v. Arrington Oil & Gas, Inc.*, 664 F.3d 1208, 1212 (8th Cir. 2012) (quoting *First Nat'l Bank of Crossett v. Griffin*, 310 Ark. 164, 169, 832 S.W.2d 816, 819 (1992)). The first rule of interpreting a contract is to "ascertain and give effect to the intention of the parties." *Smith*, 664 F.3d at 1212 (quoting *Harris v. Stephens Prod. Co.*, 310 Ark. 67, 72, 832 S.W.2d 837, 840 (1992)). To determine the intention of the parties, Arkansas courts look to the contract as a whole and the circumstances surrounding its execution. *Griffin*, 310 Ark. at 170, 832 S.W.2d at 820. Second, in construing a contract, Arkansas courts "must consider the sense and meaning of the words used by the parties as they are taken and understood in their plain, ordinary meaning." *Id.* at 169, 832 S.W.2d at 819 (quoting *Farm Bureau Mut. Ins. Co. of Ark., Inc. v. Milburn*, 269 Ark. 384, 386, 601 S.W.2d 841, 842 (1980)). Third, "different clauses of a contract must be read together and the contract construed so that all of its parts harmonize, if that is at all possible." *Griffin*, 310 Ark. at 169–70, 832 S.W.2d at 819 (quoting *Cont'l*

*Cas. Co. v. Davidson*, 250 Ark. 35, 41, 463 S.W.2d 652, 655 (1971)). "A construction that neutralizes any provision of a contract should never be adopted, if the contract can be construed to give effect to all provisions." *Tyson Foods, Inc. v. Archer*, 356 Ark. 136, 144, 147 S.W.3d 681, 686 (2004). Arkansas courts interpret words or phrases associated with a particular trade or occupation as experienced and knowledgeable members of that trade or occupation use them, unless the evidence discloses that the parties use them in a different sense. *Les–Bil, Inc. v. General Waterworks Corp.*, 256 Ark. 905, 910, 511 S.W.2d 166, 169–70 (1974).

◼ Arkansas also applies several subsidiary and ancillary cannons of construction to resolve disputes as to the meaning of ambiguous contract clauses. For example, an ambiguous contract should be construed most strongly against the party preparing it. *Bodcaw Oil Co. v. Atl. Ref. Co.*, 217 Ark. 50, 61, 228 S.W.2d 626, 633 (1950); *Hanna Oil & Gas Co. v. Taylor*, 297 Ark. 80, 82, 759 S.W.2d 563, 565 (1988) (citing *Bodcaw Oil Co.*); *Smith*, 664 F.3d at 1214, n.4 (quoting *Hanna Oil & Gas Co.*); *Whistle v. David H. Arrington Oil & Gas, Inc.*, 2:08CV00037 BSM, 2009 WL 1529819, at *5 (E.D. Ark. June 1, 2009) (quoting *Hanna Oil & Gas Co.*); *Falwell v. Am. Shale Res., LLC*, 4:06CV00609 SWW, 2007 WL 4219451, at *4, n.4 (E.D. Ark. Nov. 28, 2007) (quoting *Hanna Oil & Gas Co.*). Where the language at issue is ambiguous, "oil and gas leases are to be construed in favor of the lessor and against the lessee." *Bodcaw Oil Co.*, 217 Ark. at 61, 228 S.W.2d at 633; *Hanna Oil & Gas Co.*, 297 Ark. at 82, 759 S.W.2d at 565 (citing *Bodcaw Oil Co.*); *Smith*, 664 F.3d at 1214, n.4 (quoting *Hanna Oil & Gas Co.*); *Whistle*, 2009 WL 1529819, at *5 (quoting *Hanna Oil & Gas*

*Co.*); *Falwell*, 2007 WL 4219451, at *4, n.4 (quoting *Hanna Oil & Gas Co.*).

◼ The rule providing that an ambiguous contract should be construed most strongly against the party preparing it does not, however, apply where the parties are equal in bargaining power and have engaged in negotiations regarding the terms of the contract during the drafting process. *Penford Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 662 F.3d 497, 505 (8th Cir. 2011); *Terra Intern., Inc. v. Miss. Chem. Corp.*, 119 F.3d 688, 692 (8th Cir. 1997). "Moreover, the doctrine should not be applied when the question may be resolved in light of facts developed via extrinsic evidence." *Penford*, 662 F.3d at 505.

◼ Testimony regarding negotiations between the parties related to the meaning of a contract is admissible to show that the contract was intended to have a particular meaning that the contract will reasonably bear. *Kerr v. Walker*, 229 Ark. 1054, 1057, 321 S.W.2d 220, 222 (1959). "But such testimony must relate to an understanding that was common to both parties; it is not permissible to show the uncommunicated subjective interpretation that one party or the other placed upon the language of the contract." *Id.*

◼ Applying the foregoing principles of law to the evidence presented, for the reasons explained above, the Court finds and concludes as follows. The gas royalty clause at issue is a proceeds lease, not a market value lease. It does not require proceeds to be based on the highest price that could have been obtained. That interpretation—which is the interpretation for which Dorchester contends—would negate the first sentence of the gas royalty clause. The first sentence provides for royalty of 25% of the proceeds received from the sale of the gas produced pursuant to

the leases at issue, regardless of where those sales occur. Dorchester's interpretation would read this sentence out of the lease and require royalties to be 25% of the highest price obtainable, regardless of the price at which Chesapeake sold the gas. The second sentence provides that the proceeds on which the royalty is computed are gross proceeds, not proceeds net of expenses (with a limited exception that allows deducting from proceeds non-affiliated transportation charges incurred on regulated pipelines). The third sentence protects Dorchester from improvident sales downstream that, after deduction of the transportation charges, yield less than the gross proceeds that could have been obtained if the gas had been sold in the field or prevailing area. That third sentence means that the proceeds from the sale of gas downstream on an interstate pipeline must not be less than the proceeds from sales in the field or the proceeds from sales in the prevailing area, whichever proceeds are greater. The comparison is based upon any sales in the field or prevailing area, not just Chesapeake's sales; it requires a comparison of proceeds from sales downstream on an interstate pipeline with the greater of (1) proceeds from sales in the field or (2) proceeds from sales in the prevailing area.

IT IS SO ORDERED this 5th day of April, 2016.